UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VIRGINIA HUSSEY,
    Plaintiff,

v.

                              CIVIL ACTION NO. 20-11511-MPK[1]

EAST COAST SLURRY CO., LLC;
INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 4;
HOISTING AND PORTABLE
ENGINEERS APPRENTICESHIP &
TRAINING PROGRAM aka HOISTING
AND PORTABLE ENGINEERS
APPRENTICESHIP & TRAINING FUND,
aka HOISTING AND PORTABLE
ENGINEERS APPRENTICESHIP &
TRAINING CENTER; AND SUFFOLK
CONSTRUCTION COMPANY, INC.,
    Defendants.

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (##48, 51, 55, 57).

Kelley, U.S.M.J.

I.    <u>Introduction</u>.

       Plaintiff Virginia Hussey filed this action alleging gender discrimination and retaliation in

connection with her participation in the Hoisting and Portable Engineers Apprentice and Training

Program ("School") run by the International Union of Operating Engineers, Local 4 ("Union") in

combination with local contractors. She alleges that three Union members harassed her while she

was working as an apprentice for East Coast Slurry Co., LLC ("East Coast Slurry") on a Suffolk

---

[1] With the parties' consent, this case was assigned to the undersigned for all purposes, including
trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (#32.)

Construction Company, Inc. ("Suffolk") jobsite. (#29 ¶¶ 10, 19, 21-22.) After making complaints about the conduct to individuals affiliated with the School, Union, East Coast Slurry, and Suffolk did not resolve it, she was expelled from the School, terminated from the Union, and fired from East Coast Slurry. *Id.* ¶¶ 56-57. She brings claims against the School, Union, East Coast Slurry, and Suffolk under Title VII, 42 U.S.C. 2000e *et seq.*, and Chapter 151B, Mass. Gen. Laws ch. 151B, § 4 *et seq*. Defendants have moved, separately, for summary judgment (##48, 51, 55, 57), which plaintiff opposes (#65). For the reasons set forth below, Suffolk's motion is allowed, the Union's and School's motions are allowed in part and denied in part, and East Coast Slurry's motion is denied.

II.   <u>Factual Background</u>.

For purposes of summary judgment, the facts are presented in the light most favorable to plaintiff, the nonmoving party. *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855 (1st Cir. 2008). The facts below are undisputed unless otherwise indicated.[2]

The School runs a four-year training program and operates with equal numbers of trustees appointed by the Union and by employers who are signatories to the Union's collective bargaining agreement ("CBA"). (#67 ¶¶ 7, 8.) The School has a non-discrimination policy which sets forth a reporting procedure for incidents of discrimination and harassment. *Id.* ¶ 9. When such incidents

---

[2] The court takes the facts from plaintiff's responses to East Coast Slurry's and Suffolk's joint statement of facts, her responses to the Union's and School's joint statement of facts, and her statement of additional facts. (##66, 67, 68.) Defendants did not respond to additional facts that plaintiff provided in her statement beyond disputing several in their reply briefs. (##69, 70.) Where supported by the record and where defendants have failed to respond to certain facts propounded by plaintiff, the court will determine that material facts presented by her as being disputed do, in fact, create a genuine dispute for the purposes of summary judgment. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 15 n.2 (1st Cir. 2016) (deeming distinct facts propounded by opposing party and supported by evidence to have created a dispute and drawing reasonable inferences in favor of opposing party).

occur on a jobsite, a "[c]oordinator will refer the incident to the [Union] Business Manager and the responsible contractor for investigation, and will act as a liaison for the apprentice." *Id.* The Union has a diversity mission statement which provides that

> [a]ny harassment or discrimination will not be tolerated and, to the extent permitted by law, will be subject to [the Union's] complaint and investigation procedures. Any retaliation against any person [who has] complained about harassment and/or discrimination or any person who has cooperated with an investigation of a complaint will not be tolerated. Anyone who has experienced or observed harassment, discrimination, or retaliation is strongly encouraged to contact any member of [the Union's] Diversity Committee.

*Id.* ¶ 12. In addition, the CBA between the Union and employers included a nondiscrimination provision:

> All employees shall be hired by the employer. The Employer and the [Union] mutually agree that there shall be no discrimination with regard to an employee's race, color, religion, sex, or national origin in regard to job referral or conditions of employment. The parties to these Agreements agree to comply with and adhere to the intent and purpose of the Civil Rights Act of 1964. The [Union] agrees that it will assist the Employer in meeting these obligations under plans which have been jointly accepted by the parties.

*Id.* ¶ 13.

Plaintiff is a veteran of the U.S. Army and was deployed to Iraq twice. (#67 ¶ 2; #68 ¶ 1.) On July 1, 2017, she enrolled as an apprentice with the School. (#67 ¶ 16.) As an apprentice, she automatically became a member of the Union. *Id.* ¶ 17. She was asked to speak on behalf of the Union at the Massachusetts State House and at the Somerville City Hall. (#68 ¶ 2.) The Union's business manager, William McLaughlin, told her she was doing well and said she was a hard worker. *Id.* ¶¶ 3, 110.

Upon her enrollment and again at the start of her second year at the School, plaintiff received its Regulations and Policies. (#67 ¶ 18.) These state that "[a]ll certificates and licenses must be completed according to the curriculum. Failure to pass the prescribed course in the allotted

time, would mean repeating the year at a minimum, and may result in discipline up to and including dismissal from the [School]." *Id.* ¶ 19. As an apprentice, plaintiff worked for East Coast Slurry and a related company, A.A. Will; she was not employed by the School or the Union. *Id.* ¶ 20.

Toward the end of plaintiff's second year as an apprentice, in April 2018, she signed a disciplinary agreement with the School after failing to report that she had switched jobsites. (#67 ¶ 21; #68 ¶¶ 79-80.) She had been working for both East Coast Slurry and A.A. Will, and was going back and forth between their jobsites. (#68 ¶ 80.) The agreement stated that she would face "further disciplinary action or possible dismissal" from the School if she did not "abide by all of [its] Regulations and Policies" going forward. (#67 ¶ 21.)

During her second year as an apprentice, plaintiff began working at a jobsite for East Coast Slurry. (#67 ¶ 22.) While at the site, she worked with Bobby Atkins, who was an employee of East Coast Slurry, a member of the Union, and a former apprentice with the School. *Id.* ¶ 23. Like others on the jobsite, Atkins helped train plaintiff, though he did not have a leadership position in the Union. *Id.* Starting in September 2018, Atkins asked plaintiff out on dates, texted her, and made inappropriate comments to her. *Id.* ¶ 24; #68 ¶¶ 4, 14. She complained to another Union member and East Coast Slurry employee, Jimmy Jardine, who said he would "handle it." (#68 ¶¶ 8, 10-11.) She was then transferred to another jobsite. *Id.* ¶¶ 11, 19, 92.[3] She was paid approximately $10/hour less at the new jobsite. *Id.* ¶ 92.

Eventually, plaintiff was moved back to the same jobsite as Atkins. (#68 ¶ 13.) She was assigned to work on the same machine as him and he soon began making comments to her about her appearance, and also told her that, as a woman, she would have to work twice as hard. *Id.*

---

[3] Plaintiff alternately states her belief that she was transferred to a different jobsite because Atkins had complained about her working on a certain machine. (#68 ¶¶ 19, 92.)

¶¶ 13, 15. This time, she complained to Jardine and to the vice president of the Union, Dave Shea. *Id.* ¶¶ 16-17. In January 2019, Atkins touched plaintiff's shoulders, body, and hair even after she asked him to stop. (#67 ¶ 24.)[4] On February 14, 2019, while plaintiff was on a break with several other employees, she was sitting on a bench with her head resting on a table because she had a headache. *Id.* ¶ 25; #68 ¶ 27. Atkins approached her from behind and began stroking her from under her armpits down to her hips and back multiple times. (#67 ¶ 25.) Plaintiff states that he touched her breasts as he was rubbing her sides, but defendants dispute this. *Id.*; #68 ¶¶ 26, 28. She immediately told Atkins to stop and began yelling at him and crying. (#67 ¶ 25; #68 ¶¶ 28-29.) She then went to report the incident to her supervisors. (#67 ¶ 26.) She told Tim Walker, the Union steward on the jobsite and an East Coast Slurry employee; Craig Cunningham, a Union member and East Coast Slurry employee, John Gaffny, the School's coordinator; other A.A. Will and East Coast Slurry employees; a safety officer for Suffolk; and Alexis Dunn, a lawyer and human resources representative for A.A. Will and East Coast Slurry. *Id.* ¶¶ 26-27; #68 ¶¶ 30-31, 36-37.

Michael Bowes is the Union president and business agent, and was a trustee at the School when plaintiff was an apprentice. (#67 ¶ 14.) When Walker told him about the February 14, 2019 incident, Bowes visited the jobsite to speak with plaintiff and Atkins. *Id.* ¶ 26. Bowes told Atkins not to engage in that kind of conduct. *Id.* He told plaintiff that she was "too beautiful to . . . be on the jobsite" but said he would take care of the situation and that nothing would happen to her. (#68 ¶¶ 33-34, 111.) He and Walker advised plaintiff to stay in the cab of her machine during breaks

---

[4] In her responses to defendants' statements of facts regarding the January 2019 incident, plaintiff also seems to suggest that Atkins touched her breasts and thighs, but she does not cite support in the record for this assertion. (#66 ¶ 4 (plaintiff's response, citing no record evidence); #67 ¶ 24 (plaintiff's response, citing her deposition testimony regarding the February 14th and March 10th incidents with Atkins).

rather than join other employees in the break room. *Id.* ¶ 42. In addition, Bowes suggested to plaintiff that it would be easier to get rid of her than to move her from jobsite to jobsite to avoid harassment, and that she would have to get used to comments about her looks. *Id.* ¶¶ 46, 77, 95. Plaintiff responded that she should not have to get used to it. *Id.* ¶ 78.

After plaintiff reported the incidents with Atkins to Dunn in February 2019, Dunn told her she would look into it. (#66 ¶¶ 6-7.) During the first week of March 2019, Dunn asked to meet with plaintiff. *Id.* ¶ 7. Plaintiff told Dunn that she didn't want to discuss the matter while at the jobsite, and so they arranged to meet for lunch offsite. *Id.* ¶ 8. Dunn asked if plaintiff wanted a formal investigation into the issues, and plaintiff said she did. (#68 ¶ 84.) Despite this, plaintiff states that there was no investigation because no witnesses were interviewed, Dunn did not speak with Atkins, nor did Dunn review video from cameras that were filming the jobsite. *Id.* ¶¶ 87, 100. Dunn told Hussey that the issues with Atkins were a Union problem and that the Union would have to handle it. *Id.* ¶¶ 38-39.

Several weeks later, on March 1, 2019, plaintiff was operating a crane at the jobsite when Atkins began yelling at her. (#67 ¶ 28.) He told her that she did not know how to operate the crane and began asking her about how to operate it, ultimately calling her a "f*cking idiot" and telling her that she should not operate cranes. *Id.* Plaintiff called Walker, who came to the jobsite and told Atkins to stay away from her, and reminded him that he had been warned to stay away from her several times. *Id.* Days later, Atkins walked over to plaintiff as she was talking to Walker and told her to "shut up." *Id.* ¶ 29. Walker again told Atkins to stay away from plaintiff. *Id.*

Bowes told plaintiff that he could not remove Atkins from the jobsite. (#68 ¶¶ 34, 112.) On March 7 or 8, 2019, however, Bowes called East Coast Slurry's manager, Cary Will, to ask the company to separate plaintiff and Atkins. (#66 ¶ 10; #67 ¶ 30.) The day after Bowes' call, Will

transferred Atkins to a different jobsite. (#66 ¶ 11; #67 ¶ 31.) That same day, Atkins came up behind plaintiff and pushed her, causing her to stumble and catch herself just before falling down. (#67 ¶ 31; #68 ¶ 41.) She then learned that he was being transferred to a different jobsite. (#68 ¶ 41.) Bowes and Walker told her that Atkins was being transferred because of his actions towards her, (#67 ¶ 31).

On or about March 10, 2019, Henry Noyes replaced Atkins at the East Coast Slurry jobsite. (#67 ¶ 32.)[5] Noyes was also a Union member and had no leadership positions there. *Id.* From the time he started at the jobsite in early March and continuing until April 2019, Noyes asked plaintiff out on dates at least four separate times. *Id.* ¶ 33; #68 ¶ 47. Walker overheard one of these conversations and told Noyes to stop. (#67 ¶ 33.) Bowes came to the jobsite and also told Noyes to stop. *Id.* ¶ 34. Noyes continued making comments to plaintiff about her looks, calling her "hot" and "sexy" up until the day before she left the jobsite in August 2019. (#68 ¶¶ 66, 76.)[6] Plaintiff told Walker; Cunningham; Tom McEvoy, an instructor at the School; and a Suffolk safety officer about Noyes' ongoing comments. *Id.* ¶¶ 50-51, 88-89.

Apprentices must take certain tests and obtain certain licenses to remain in the School. (#67 ¶¶ 19, 35.) By the end of their second year, apprentices must pass the 4B Hoisting examination. *Id.* ¶ 35. Apprentices may take the exam as many times as needed to pass. *Id.* ¶ 39; #68 ¶ 114. Plaintiff did not sign up to take the exam until April 2019, months before the end of her second

---

[5] Neither Noyes nor Atkins were Suffolk employees. (#66 ¶¶ 27-28.)

[6] Defendants dispute that the comments continued until August 2019, contradicting plaintiff's testimony. (#67 ¶ 33 (arguing that Noyes did not continue his conduct past April 2019); #66 ¶ 15 (stating that Noyes made comments to plaintiff "later"); #68 ¶ 66 (citing plaintiff's deposition testimony in support of plaintiff's contention that the conduct continued until August 2019); #68-1 at 124-125 (plaintiff's deposition testimony that the conduct continued until the day before she left the East Coast Slurry jobsite in August 2019).

year, and did not study for the exam until after she had failed it twice. (#67 ¶¶ 36-37.) After she had taken the test in April 2019, weeks after Atkins was reassigned to another jobsite, McEvoy asked plaintiff why she had not passed the exam. *Id.*; #68 ¶¶ 52, 54-55. In response, plaintiff told him about Atkins' conduct towards her. *Id.* Plaintiff states that she was unable to study due to the effects of the ongoing harassment she was experiencing. (#67 ¶ 36; #68 ¶¶ 52, 54, 56.) McEvoy told her that she had to take the exam, and that Bowes was "handling" the harassment. (#67 ¶ 37.) In contrast, Bowes told plaintiff not to worry about the exam. (#68 ¶ 57.) In addition to speaking with Bowes and McAvoy about the harassment, plaintiff also told others at the School, including a teacher and Gaffny. *Id.* ¶¶ 58-60.

On August 7, 2019, Gaffny sent plaintiff a letter informing her that she had not met the requirements to pass her second year as an apprentice because she had failed the 4B Hoisting examination. (#67 ¶ 42.) She was further advised to attend a meeting on August 27, 2019 with the School's board of trustees. *Id.* No one from East Coast Slurry or Suffolk was at the meeting, nor did they initiate the disciplinary proceedings against plaintiff. (#66 ¶¶ 23, 25). Bowes was present at the meeting in his capacity as a School trustee. (#67 ¶ 43.) Before the meeting, he told plaintiff not to worry about the exam, that he would tell the board about it and all she had been going through. (#68 ¶ 63.) Minutes from that meeting indicate that plaintiff addressed the board and told them that she had been having a problem with a coworker on a jobsite but that she accepted responsibility for failing the exam. (#67 ¶ 43.) Plaintiff adds that when she began telling the board about the harassment she had been experiencing and why it had made it difficult for her to study for the exam, Bowes stood up, aggressively put his hands on a table, and said he had already taken care of it and not to discuss it further. (#68 ¶¶ 64, 116.)

During the meeting, the board voted to expel plaintiff from the School, citing expulsion as "standard practice" for plaintiff's violation of the School's Rules and Regulations and the terms of her April 2018 disciplinary agreement. (#67 ¶ 43.) Plaintiff contends, however, that other apprentices have been allowed to retake a year rather than face dismissal and that the School's Rules and Policies allow for repeating a year. *Id.*; #68 ¶¶ 117-119. At that same meeting, another apprentice, Nick Gates, appeared before the board for failing an exam. *Id.* ¶ 134.[7] He was permitted to retake his third year and was placed on a disciplinary agreement. (#67 ¶ 44.)

The day after the board meeting, on August 28, 2019, Bowes went to the East Coast Slurry jobsite where plaintiff was working and told her that she had been expelled from the School, resulting in automatic termination from the Union. (#67 ¶ 46.)[8] Plaintiff states that Bowes also told her it was her "last day" on the job. *Id.* ¶ 47; #68 ¶¶ 71, 113. She also states that East Coast Slurry could have continued to employ her even if she was no longer an apprentice with the School or member of the Union because they employed others who were not members of the Union. (#66 ¶ 26; #68 ¶¶ 90-91.) East Coast Slurry disputes this. (#74 at 9-10.)

Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") on April 13, 2020. (#67 ¶ 48.) She states that she was not provided with written notice of her right to file a discrimination complaint with the MCAD. (#68 ¶ 146.)

---

[7] Although not included in the parties' statements of facts, the School maintains that Gates, unlike plaintiff, was not subject to a disciplinary agreement at the time of the board meeting. (#52 at 18.) This does not appear to be disputed and is supported by the record. (#68-4 at 15-16, 18, 26 (Gates deposition transcript).)

[8] Plaintiff's dispute as to whether termination from the Union was automatic appears to stem from her argument that she could have repeated a year at the School, not from a contention that she could have remained a member of the Union without completing her apprenticeship. *See* #67 ¶ 46.

III.   <u>Standard of Review</u>.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Federal Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (internal citation and quotations marks omitted). "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate "if the record is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014).

The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citation omitted). A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (internal citation and quotations marks omitted). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nuñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal citation and quotation marks omitted).

In determining whether summary judgment is proper, the court must view the record in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). Rule 56 "mandates the entry

10

of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)).

IV.   <u>Discussion</u>.

Through their separate motions, defendants seek summary judgment on several grounds. The court will analyze each motion in isolation with the exception of defendants' statute of limitations defense.

A.   <u>Plaintiff's Claims</u>.

Plaintiff brings the following claims: discrimination, retaliation, and creation of a hostile work environment in violation of Title VII against all defendants (Count I); discrimination, retaliation, and creation of a hostile work environment in violation of Chapter 151B, § 4(1) against East Coast Slurry and Suffolk (Count II); discrimination, retaliation, and creation of a hostile work environment in violation of Chapter 151B, § 4(2) against the Union (Count III); discrimination, retaliation, and creation of a hostile work environment in violation of Chapter 151B, § 4(2) against the School (Count IV); discrimination and retaliation in violation of Chapter 151B, § 4(4) against all defendants (Count V); interference with the exercise of her right to be free from sexual harassment in violation of Chapter 151B, § 4(4A) against all defendants (Count VI); and discrimination and retaliation in violation of Chapter 151B, § 4(16A) against East Coat Slurry and Suffolk (Count VII). (#29 ¶¶ 70-83.)

B.    Statute of Limitations.

All defendants have moved for summary judgment on the basis that some or all of plaintiff's claims are time-barred because they relate to conduct that occurred outside of the MCAD's 300-day deadline to file a claim. (#49 at 6; #52 at 12; #56 at 6; #59 at 6-7.)[9] Plaintiff counters that her claims are timely by virtue of the continuing violation doctrine and that, even if not, equitable tolling should apply. (#65 at 8-10.)

"Discrimination claims under Title VII and Chapter 151B must be pursued administratively prior to the filing of a lawsuit. Under both statutes, a charge must be filed with the MCAD within 300 days of the latest alleged discriminatory event." *Harrington v. Lesley Univ.*, No. 20-cv-11718, 2021 U.S. Dist. LEXIS 153603, at *11-12 (D. Mass. Aug. 12, 2021); *see Savage v. City of Springfield*, No. 18-cv-30164, 2021 U.S. Dist. LEXIS 44150, at *15 (D. Mass. Mar. 8, 2021) ("Because [plaintiff] filed with a state agency, Title VII's 300-day deadline applies." (citing 42 U.S.C. § 2000e-5(e)(1))).

Plaintiff filed her complaint with MCAD on April 13, 2020. (#67 ¶ 48.) Her allegations regarding discriminatory conduct would therefore need to have taken place within 300 days of that complaint, with the earliest date of alleged conduct taking place on or after June 18, 2019. The parties agree that conduct by Atkins began in September 2018 and ceased in March 2019, before the deadline. *Id.* ¶¶ 24, 31. Conduct by Noyes began in March 2019 and continued into August 2019, well into the statutory period. *Id.* ¶ 33; #68 ¶¶ 47, 66; #68-1 at 124, 151, 152-153 (reporting that Noyes' conduct continued until the day before plaintiff was terminated). Plaintiff was terminated from the Union, School, East Coast Slurry, and the Suffolk Construction site in August

---

[9]  The court will separately address the School's argument that the MCAD's 300-day deadline does not apply to it because it is an ERISA benefit program that cannot be regulated by MCAD due to preemption by federal law. *See* #52 at 12-13.

2019, within the statutory period. (#67 ¶¶ 43, 45-47.) In order to salvage her claims as to Atkins' and Noyes' pre-June 2019 conduct, plaintiff invokes the continuing violation doctrine, and cites her August 2019 termination as an anchoring act. (#65 at 8, 27, 30.)

"The continuing violation doctrine 'is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims.'" *Loubriel v. Fondo Del Seguro Del Estado*, 694 F.3d 139, 144 (1st Cir. 2012) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001)). "This anchor violation is only timely if it is part of and exposes a pattern of actionable discrimination." *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 22 (1st Cir. 2001). "[A] court, when ascertaining whether an anchoring act is 'substantially related' to an untimely act, should ask if the subject matter of the anchoring act is 'sufficiently similar' to that of the untimely act." *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 474 n.7 (1st Cir. 2010) (quoting *O'Rourke*, 235 F.3d at 731). Plaintiff "bears the burden of establishing that the continuing violation doctrine applies." *Harrington*, 2021 U.S. Dist. LEXIS 153603, at *23. Courts analyze

> three factors to assess the sufficiency of a serial-continuing-violation claim: (1) whether the subject matter of the discriminatory acts is sufficiently similar to render the otherwise untimely acts substantially related to the timely acts; (2) whether the acts occur frequently, repetitively, or continuously or are isolated and discrete; and (3) whether the acts are sufficiently permanent to make the plaintiff aware of the need to assert his or her rights.

*Rivera-Rodriguez*, 265 F.3d at 22 (citing *O'Rourke*, 235 F.3d at 731).[10]

---

[10] The continuing violation doctrine as applied to Chapter 151B claims "is more sympathetic to plaintiffs" because it allows for the limitations period to begin "when the plaintiff knew that her employer would not take steps to remedy the harassment, rather than when she had notice that she had an actionable claim." *Brader v. Biogen Inc.*, 362 F. Supp. 3d 25, 38-39 (D. Mass. 2019), *aff'd* 983 F.3d 39 (1st Cir. 2020).

Defendants argue that plaintiff's August 2019 termination was not substantially related to Atkins' conduct and Noyes' pre-June 2019 conduct so as to qualify as an anchoring act. *See, e.g.*, #56 at 11-12. East Coast Slurry also argues that Noyes' post-June 2019 conduct cannot serve as an anchoring act because it was different in character than his pre-June 2019 conduct and Atkins' conduct. *Id.* at 10-11.[11] Ultimately, this comes down to a factual dispute regarding whether the pre-June 2019 acts were substantially similar to those within the limitations period (whether the anchoring act is viewed as Noyes' post-June 2019 conduct or plaintiff's termination). The First Circuit has confirmed that such disputes are often best left to a jury:

> "Sexual harassment serious enough to constitute unlawful discrimination on grounds of sex is often a cumulative process rather than a one time event. In its early stages it may not be diagnosable as sex discrimination, or may not cross the threshold that separates the nonactionable from the actionable, or may not cause sufficient distress to be worth making a federal case out of, or may not have gone on long enough to charge the employer with knowledge and a negligent failure to take effective remedial measures." While sometimes these issues may be resolved as a matter of law, they are often better resolved by juries, with jurors reflecting the lessons from their own life's experiences.

---

[11] East Coast Slurry also suggests that, because plaintiff has not identified a specific date on which Noyes last made a comment to her, his post-June 2019 conduct cannot serve as an anchoring act. (#74 at 4.) The case law East Coast Slurry cites for this proposition, however, does not support it. For example, in *Ruffino v. State St. Bank & Tr. Co.*, the court found that, "although [plaintiff] alleges generally that [an employee] continued to harass her until October of 1991, when specifically asked at deposition, she could cite to no offensive, humiliating or demeaning conduct on his part" after March 1991. 908 F. Supp. 1019, 1039 (D. Mass. 1995); *see id.* (stating that "there must be more than the legacy of suspicion and ongoing ill feeling on the part of the plaintiff from past acts for her to jump the hurdle set up by the limitations period"). This is in stark contrast to plaintiff's deposition testimony, where she reported that Noyes commented on her looks and called her suggestive names up until her termination in August 2019. (#68-1 at 124-125 (plaintiff's deposition testimony that the conduct continued until the day before she left the East Coast Slurry jobsite, in August 2019)); *id.* at 152-153, 175-176, 227 (citing examples of Noyes' comments). Plaintiff has cited more than mere "suspicion" of harassment or lingering "ill feeling" for purposes of seeking recourse through the continuing violations doctrine.

14

*O'Rourke*, 235 F.3d at 732 (quoting *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996)); *see id.* (noting that a jury could have found case to have fit within continuing violation doctrine where plaintiff made internal complaints that led nowhere, finally leading her to file a complaint with the EEOC); *Cuddyer v. Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 943 (Mass. 2001) (remanding for jury decision as to whether the continuing violation doctrine applied to Chapter 151B claim). This court agrees that the issue is inappropriate for resolution at summary judgment and should instead rest with a jury.[12]

    C.    <u>East Coast Slurry's Motion for Summary Judgment</u>.

East Coast Slurry's sole basis for summary judgment is that plaintiff's claims as to the company lie outside of the statute of limitations. (#55 at 1; #56 at 1.) Having deferred resolution of this question for trial, summary judgment as to East Coast Slurry is denied.

    D.    <u>Suffolk's Motion for Summary Judgment</u>.

Suffolk argues that plaintiff, Atkins, Noyes, and Bowes were not its employees, and that it was therefore not an "employer" for purposes of Title VII or Chapter 151B. (#59 at 4-6.) In addition, Suffolk states that holding it liable for discrimination or retaliation by "any person" under Chapter 151B is also inappropriate. *Id.*

Title VII makes it "an unlawful employment practice for an employer[] . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

---

[12] Equitable tolling may be appropriate where, as here, a plaintiff alleges some misconduct by a defendant that prevented or deterred her from filing a timely claim. *See Kelley v. NLRB*, 79 F.3d 1238, 1248 (1st Cir. 1996) ("Cases in which the equitable tolling doctrine is invoked are most often characterized by some affirmative misconduct by the party against whom it is employed, such as an employer or an administrative agency."). For the reasons discussed as to the continuing violation doctrine, including disputed facts, whether equitable tolling should apply in the absence of the continuing violation doctrine is best decided by a jury.

employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). In addition, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." *Id.* § 2000e-3(a). Likewise, under Massachusetts law, "[s]ubsections (1) and (16A) of Chapter 151B, § 4 make it unlawful '[f]or an employer, personally or through its agents, to sexually harass any employee.'" *Cagle v. Estes*, 531 F. Supp. 3d 419, 428 (D. Mass. 2021) (quoting Mass. Gen. Laws ch. 151B, § 4(16A)) (citing Mass. Gen. Laws ch. 151B, § 4(1)). These statutes require actions to be taken by an employer.

The First Circuit's analysis of whether an employer/employee relationship exists "stresses the importance of actual circumstance of an entity's overall control over key aspects of an employment relationship with a particular set of putative employees." *Lopez v. Massachusetts*, 588 F.3d 69, 86 (1st Cir. 2009); *see Barton v. Clancy*, 632 F.3d 9, 18 (1st Cir. 2011) (discussing the term "employer" and stating that "in interpreting ch. 151B, Massachusetts courts follow federal case law construing analogous provisions of federal antidiscrimination law"). Plaintiff states that she reported her concerns about Atkins' and Noyes' conduct to Suffolk's safety officer at the work site, (#68 ¶¶ 36, 88-89), but otherwise provides no evidence or argument that anyone at Suffolk directed or controlled either hers, Noyes', or Atkins' work. *See* #65. Nor is there an allegation that connects Bowes to Suffolk in a manner that would suggest it was directing or employing him. Counts I, II, and VII against Suffolk are grounded in plaintiff's assertion that Suffolk was her employer and therefore lack evidentiary support sufficient to defeat summary judgment.

Plaintiff's remaining claims as to Suffolk, under §§ 4(4A) and 4(4) of Chapter 151B require actions taken by "any person." "[I]n certain factual circumstances, the MCAD and at least one

Massachusetts appellate decision have interpreted [Chapter 151B] § 4(4A) to impose liability on 'any person' for interference with the plaintiff's right to work in an environment free of unlawful harassment, even where that person is not the plaintiff's employer or employer-agent." *Cagle*, 531 F. Supp. 3d at 435 (second alteration in original) (quoting *Barton*, 632 F.3d at 21). "By including § 4(4A) in c. 151B, the Legislature intended to extend the statute's reach beyond employer-employee interactions to encompass discriminatory conduct by third parties to which an employee could be subjected." *McLaughlin v. City of Lowell*, 992 N.E.2d 1036, 1058 n.34 (Mass. App. Ct. 2013) (quoting *Mass. Commn. Against Discrimination v. Thomas O'Connor Constructors*, MCAD No. 98-BEM-3762 (Jan. 21, 2005)). "As such, § 4(4A) is best understood as a device through which an individual falling outside the scope of the definition of 'employer' may otherwise be liable for conduct which the antidiscrimination statute aims to prevent." *Id.* That Suffolk was not plaintiff's employer is therefore irrelevant to analysis of its liability under § 4(4A).

"The Supreme Judicial Court has concluded that interference under c. 151B, § 4(4A), 'is appropriately considered with, and interpreted in light of, the words "coerce," "intimidate," and "threaten" that precede it, and that each implies some form of intentional conduct.'" *Runyon v. Wellington Mgmt. Co., LLP*, No. 13-cv-11236, 2015 U.S. Dist. LEXIS 35120, at *13-14 (D. Mass. Mar. 20, 2015) (quoting *Lopez v. Commonwealth*, 978 N.E.2d 67, 78 (Mass. 2012)). "To establish a claim for interference under c. 151B, § 4(4A), then, [plaintiff] must show that [defendants] interfered with [her] rights in deliberate disregard of those rights. 'Deliberate disregard requires an intent to discriminate.'" *Id.* (quoting *Canfield v. Con-Way Freight, Inc.*, 578 F. Supp. 2d 235, 242 (D. Mass. 2008)). Plaintiff has not alleged, let alone provided any evidence to support a finding that Suffolk or its agents *intentionally* failed to act on her behalf rather than merely forgetting to follow through or leaving it to the Union, School, or East Coast Slurry to resolve. At best, she has

alleged that she told a Suffolk safety officer of her complaints and that nothing was done to resolve them. This does not rise to the level of conduct required under § 4(4A). *See Lopez*, 978 N.E.2d at 78.

Under § 4(4), it is unlawful "[f]or any person . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter." Mass. Gen. Laws ch. 151B, § 4(4). A plaintiff "bringing a retaliation claim is not complaining of discriminatory treatment as such, but rather of treatment that 'punish[es]' her for complaining of or otherwise opposing such discriminatory treatment." *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 50 N.E.3d 778, 800 (Mass. 2016) (alteration in original) (quoting *Ruffino v. State St. Bank & Trust Co.*, 908 F. Supp. 1019, 1040 (D. Mass. 1995)).

> To survive summary judgment on a claim of retaliation, an employee must produce evidence from which a jury could infer four elements. First, there must be evidence that the employee "reasonably and in good faith believed that the employer was engaged in wrongful discrimination." Second, there must be evidence that the employee "acted reasonably in response to that belief," through reasonable acts meant "to protest or oppose . . . discrimination" (protected activity). Third, there must be evidence that the employer took adverse action against the employee. Finally, there must be evidence that the adverse action was a response to the employee's protected activity (forbidden motive).

*Id.* (citations omitted) (quoting *Pardo v. General Hosp. Corp.*, 841 N.E.2d 692, 707 (Mass. 2006)).

Plaintiff alleges that she was expelled from the School, terminated from the Union, and fired from East Coast Slurry in retaliation for her complaints about harassment from Atkins and Noyes. She has, however, neither alleged nor provided evidence that Suffolk took any adverse action against her or had any involvement in the other defendants' decisions to expel, terminate, or fire her. Plaintiff has not adduced what is needed to survive summary judgment on her § 4(4) claim against Suffolk.

Summary judgment for Suffolk is therefore allowed as to all counts.

18

    E.    <u>Union's Motion for Summary Judgment</u>.

The Union argues it had no duty to ensure that plaintiff was not subjected to a hostile work environment or discrimination because she worked for East Coast Slurry, (#49 at 9-11), while plaintiff contends that the Union did owe her a duty, (#65 at 20-23). The Union also argues that plaintiff cannot succeed on her hostile work environment, discrimination, and retaliation claims. (#49 at 7-9, 15-18.)

    1.    <u>Plaintiff's State Law Claims Against the Union</u>.

Because the Union is regulated by federal law that, in some instances, preempts state law, the court first addresses plaintiff's state law claims against it.[13]

"[S]tate law is preempted whenever a plaintiff's claim invokes rights derived from a union's duty of fair representation." *Mason v. Cent. Mass Transit Mgmt./Worcester Reg'l Transit Auth.*, 394 F. Supp. 3d 166, 173 (D. Mass. 2019) (alteration in original) (quoting *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 830 (1st Cir. 1997)).

> A union acting in its representative capacity owes this duty to those on whose behalf it acts. The duty derives from the union's status *qua* exclusive bargaining agent. It implicates section 9(a) of the [National Labor Relations Act], and "includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." . . . Consequently, state law is preempted whenever a plaintiff's claim invokes rights derived from a union's duty of fair representation.

*BIW Deceived*, 132 F.3d at 830 (citations omitted) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)); *see Bergeron v. Henderson*, 52 F. Supp. 2d 149, 153 (D. Me. 1999) ("Thus, if the state

---

[13] In her opposition, plaintiff argued that the Union failed to file grievances on her behalf in violation of Title VII. (#65 at 20-22); *see also infra*, Section IV.E.2 at n.15. In response, the Union raised a defense that a Union's common law duty of fair representation preempts such a claim under state law. (#70 at 11-12 (citing *BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 830 (1st Cir. 1997)).) As discussed here, the court finds that the Union's preemption defense applies broadly to plaintiff's state-law claims.

claim creates no new rights for an employee and imposes no duty on a union not already present under the federal duty of fair [re]presentation, the state claim is preempted.").

"In determining whether a state law claim raises any rights separate from the duty of fair representation, courts focus on the conduct at the root of the controversy, not the plaintiff's characterization of the conduct in the complaint." *Lemerich v. Int'l Union of Operating Eng'rs, Local 877*, No. 01-cv-124, 2002 U.S. Dist. LEXIS 7102, at *21 (D. Me. Apr. 19, 2002). Here, plaintiff alleges under Massachusetts state law that the Union failed to adequately address her complaints, either directly or through East Coast Slurry, and that Bowes made discriminatory comments to her while ostensibly attempting to remedy the situation. In essence, then, she is alleging that the Union discriminated against her when it should have been serving her interests. Plaintiff's state law claims therefore fall under the Union's duty of fair representation and are preempted. *See Bergeron*, 52 F. Supp. 2d at 154 (finding allegation that Union "failed to stop the sexual harassment and discrimination against" plaintiff was "connected with the Union's activities as her representative"); *Sousa v. Stop & Shop Supermarket Co.*, No. 98-cv-12629-GAO, 1999 U.S. Dist. LEXIS 9367, at *3-4 (D. Mass. Apr. 16, 1999) (finding state claims preempted by duty of fair representation because, "though [plaintiff] attempts to cast his claim against [the union] as one arising under the Massachusetts anti-discrimination statute, the complaint in substance asserts a failure by [the union] to fulfill an obligation it assumed under the collective-bargaining agreement").[14]

---

[14] Even if plaintiff's state-law retaliation claim against the Union could arguably survive preemption, for the reasons discussed below as to her Title VII retaliation claim, it fails as a matter of law.

2.     <u>Whether the Union Owed Plaintiff a Duty Under Federal Law</u>.

The law is unsettled as to whether a union owes its members a duty to prevent or remediate

discrimination that violates Title VII while its members are working for employers distinct from

the union itself. The court is persuaded by those courts who, under similar circumstances, have

found that unions do owe their members such a duty.

Unlike state-law claims that are preempted if tied to a union's duty of fair representation,

"[i]t is axiomatic that a union's failure to adequately represent union members in the face of

employer discrimination may subject the union to liability under either Title VII or its duty of fair

representation." *Rainey v. Town of Warren*, 80 F. Supp. 2d 5, 17 (D.R.I. 2000).

> Title VII . . . states, 'It shall be an unlawful employment practice for a labor
> organization—(1) to exclude or to expel from its membership, *or otherwise to
> discriminate against*, any individual because of his race, color, religion, sex, or
> national origin.' Thus the plain language of the statute suggests that unions may be
> liable for any discrimination, including a claim of hostile work environment.

*Dowd v. USW, Local No. 286*, 253 F.3d 1093, 1102 (8th Cir. 2001) (quoting 42 U.S.C. § 2000e-

2(c)(1)); *see Phillips v. UAW Int'l*, 854 F.3d 323, 326-327 (6th Cir. 2017) (stating in dicta that

"applying the usual tools of statutory interpretation to § 2000e-2(c)(1)'s text might support a

reading that Title VII prohibits unions from creating hostile work environments, just like it does

for employers"); *Seymore v. Shawver & Sons*, 111 F.3d 794, 798 (10th Cir. 1997) ("A union cannot

acquiesce in a company's prohibited employment discrimination and expect to evade Title VII

liability for such discrimination." (quoting *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1310 (10th

Cir. 1980))).[15]

---

[15] Plaintiff references a Supreme Court decision, *Goodman v. Lukens Steel Co.*, 482 U.S. 656
(1987), for the proposition that the Union violated Title VII by choosing not to file a grievance
regarding discriminatory conduct on the East Coast Slurry jobsite. (#65 at 21.) But, as the Union
notes, she has provided no evidence regarding any grievances she attempted to file or the Union's
refusal to file same, or evidence regarding the grievance process. (#70 at 11.) Nor has plaintiff

Although some courts have refused to conclude that unions owe their members an affirmative duty to redress discriminatory conduct, they typically distinguish situations where, as here, a union is accused of not just ignoring but participating in the discrimination. *See Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832 (8th Cir. 2002) ("Though the Unions were prohibited from causing or assisting unlawful discrimination by [plaintiff's] employer, nowhere in either statute do we find language imposing upon unions an affirmative duty to investigate and take steps to remedy employer discrimination."); *cf. Egger v. Local 276, Plumbers & Pipefitters Union*, 644 F. Supp. 795, 802 (D. Mass. 1986) ("Under Title VII, a labor organization has an affirmative duty to alleviate sex discrimination in employment. A union therefore violates Title VII if it acquiesces in an employer's discriminatory policies and procedures.").

Taking all reasonable inferences in plaintiff's favor, she asserts that Bowes, who was president of the Union at the time of the events at issue, told her he would "take care of" the problem; told her to keep her complaints "on the down low"; instructed her to avoid other employees at the jobsite by staying in her machine during breaks; failed to effectively address the harassment in spite of his promises to do so; and told plaintiff that "[i]t would be easier to get rid of" her than to try to find her a jobsite free from discrimination. (#68 ¶¶ 42, 46, 111; #68-1 at 63–64.) It is unclear at this stage whether Bowes was taking these actions in his capacity as Union president or as trustee of the School. Assuming for the purposes of summary judgment that he was acting in a dual capacity, a jury could find that the Union had a duty and failed to meet it on these disputed facts. *See Ahmed*, 752 F.3d at 495.

---

brought a claim for breach of the duty of fair representation. *See Rainey*, 80 F. Supp. 2d at 17 (discussing differences between claim under Title VII and claim for breach of duty of fair representation).

3.     <u>Whether the Union Created a Hostile Work Environment</u>.

The Union argues that plaintiff cannot succeed on her hostile work environment claim because the conduct she alleges was not severe or pervasive; and because it was not objectively or subjectively offensive. (#49 at 7-9.)

"A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). The elements of such a claim under Title VII include:

> (1) that [plaintiff] is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Hernández v. Wilkinson*, 986 F.3d 98, 102 (1st Cir. 2021) (quoting *O'Rourke*, 235 F.3d at 728).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). "These circumstances 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,' but are by no means limited to them, and 'no single factor is required.'" *Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008) (quoting *Harris*, 510 U.S. at 23); *see id.* ("[B]ehavior like fondling, come-ons, and lewd remarks is often the stuff of hostile environment claims . . . . But . . . no particular 'types of behavior' are essential to a hostile environment claim."). For example, "sex-based harassment that is not overtly sexual is nonetheless actionable under Title VII, so evidence of that sort may be admissible." *O'Rourke*, 235 F.3d at

729. "Subject to some policing at the outer bounds, that question is commonly one of degree—both as to severity and pervasiveness—to be resolved by the trier of fact on the basis of inferences drawn 'from a broad array of circumstantial and often conflicting evidence.'" *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002) (quoting *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 895 (1st Cir. 1988)).

For the purposes of summary judgment, the Union allows that plaintiff has met the first three elements. (#49 at 7.)

a.   Severe or Pervasive Element.

Plaintiff need only prove that the conduct was severe *or* pervasive. She has provided evidence that could allow a jury to find the conduct to have been pervasive in that it lasted for nearly a year, was perpetrated by three separate individuals who were affiliated with the Union, and created an environment where she was unable to take breaks with her coworkers but instead had to stay in her machine. *See Dacunha v. Skip Sagris Enters.*, No. 18-cv-10999-DJC, 2020 U.S. Dist. LEXIS 158056, at *19 (D. Mass. Aug. 31, 2020) (finding that, at summary judgment, plaintiff's reports of almost daily harassing comments over the course of one month was sufficient to allow a jury to determine whether conduct was pervasive).[16] As to severity, Atkins' physical harassment of plaintiff, in combination with the comments from Atkins, Noyes, and Bowes, could

---

[16] Bowes was both a School trustee and the Union's president. It is unclear whether he was visiting the East Coast Slurry worksite and communicating with plaintiff in his capacity as trustee or president. At trial, a factfinder would need to determine which role he was occupying—perhaps both—in order to determine which, if any, entities would be liable for his conduct.

be deemed by a factfinder to be sufficiently severe.[17] *See Gorski*, 290 F.3d at 474 (holding that factfinder should determine the degree of severity or pervasiveness).

b.   Objectively and Subjectively Offensive Element.

The Union claims that the conduct at issue was neither objectively nor subjectively offensive. (#49 at 8-9.) Plaintiff states that she cried and yelled at Atkins after he touched her in the breakroom, and that—on this and other occasions—she complained about his and Noyes' conduct to a host of people. In addition, she states that she was so disturbed by the harassment that she was unable to complete the School's requirements in spite of doing well in the program prior to the harassment. "Physical and psychological effects of a hostile work environment . . . are often the basis of showing subjective interference with work performance." *Romero v. McCormick & Schmick Rest. Corp.*, 448 F. Supp. 3d 1, 7 (D. Mass. 2020) (citing *Noviello v. City of Boston*, 398 F.3d 76, 83, 94 (1st Cir. 2005)). On this evidence, a jury could find that she found the conduct subjectively offensive.

"The question of whether a plaintiff was subjected to an objectively hostile environment should generally be determined by the finder of fact, 'assess[ing] the matter on a case-by-case basis, weighing the totality of the circumstances.'" *Sullivan v. Mass. Bay Commuter R.R. Co., LLC*, No. 07-cv-10875-DPW, 2009 U.S. Dist. LEXIS 34355, at *23 (D. Mass. Apr. 22, 2009) (alteration in original) (quoting *Noviello*, 398 F.3d at 94). The parties agree that Atkins was removed from the worksite as a result of his conduct towards plaintiff and that Noyes' conduct began almost immediately after Atkins' departure, and plaintiff states that Bowes made comments

---

[17] The School and Union dispute that Atkins touched plaintiff's breasts, noting that she did not allege this in her MCAD complaint. (#69 at 4-5; 70 at 4-5.) Based on simple human anatomy, a jury could draw a reasonable inference that, when Atkins passed his hands under plaintiff's armpits, he could have touched her breasts.

25

to her about the need to simply accept the harassment. It should be left to the jury to determine whether the conduct was objectively offensive.

          c.     <u>Employer Liability Element</u>.

The court has already addressed the Union's contention that it had no duty to plaintiff. The Union also argues that it cannot be held liable for Noyes' and Atkins' conduct because they were not plaintiff's supervisors. (#49 at 11-13.)

> An employer's liability for a hostile work environment claim depends on the harasser's employment status relative to the victim's: [the Union] is vicariously liable if [plaintiff's] supervisor . . . created a hostile work environment, but if a co-worker created the hostile work environment, [the Union] will be held liable only if it was negligent either in discovering or remedying the harassment.

*Torres-Negron v. Merck & Co.*, 488 F.3d 34, 40 (1st Cir. 2007) (citations omitted). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013). This authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 271 (1st Cir. 2014) (quoting *Noviello*, 398 F.3d at 96); *see id.* at 272 (stating that, "[a]s *Vance* recognizes, at some point the ability to provide advice and feedback may rise to the level of delegated authority sufficient to make someone a supervisor").

Plaintiff was assigned to work on a machine with Atkins, and Noyes later replaced him; both were Union members. Plaintiff states that, because she was an apprentice with the School, they supervised her work, but she has not provided any evidence to support their ability to take any tangible employment action against her. *See Velázquez-Pérez*, 753 F.3d at 272. Even drawing

inferences in plaintiff's favor, they were her coworkers—rather than supervisors—for purposes of Title VII.[18]

Aside from Atkins and Noyes, plaintiff also states that Bowes, the Union president, was ineffective in remediating their harassment and also participated in it. When plaintiff was expelled, terminated from the Union, and fired from East Coast Slurry, Bowes was the one who delivered the news to her. This suggests that he was "empowered" to take these "tangible employment actions" against plaintiff. *Id.* As to whether Bowes' efforts to remedy the harassment were sufficient, this is the subject of a factual dispute between the parties and is therefore inappropriate for resolution at summary judgment. *See Morehouse v. Berkshire Gas Co.*, 989 F. Supp. 54, 64 (D. Mass. 1997) (noting that "whether [defendant] took appropriate and adequate remedial action following the incident is a disputed issue of fact" and denying summary judgment).

### 4.   Whether the Union Discriminated Against Plaintiff.

The Union contends that it did not discriminate against plaintiff by terminating her from the Union, but rather that she was terminated because of her expulsion from the School. (#49 at 15-17.)

"Employment discrimination claims alleging disparate treatment under Title VII . . . 'ordinarily proceed under the three-step, burden-shifting framework outlined in *McDonnell Douglas*'" and later Supreme Court decisions. *Bourbeau v. City of Chicopee*, 445 F. Supp. 2d 106, 114 (D. Mass. 2006) (quoting *Quinones v. Houser Buick*, 436 F.3d 284, 289 (1st Cir. 2006)).

---

[18] Plaintiff's opposition seems to acknowledge this in focusing on Bowes' supervisory position rather than Atkins' and Noyes'. (#65 at 23 (distinguishing Bowes from Atkins and Noyes by stating that "Bowes, however, certainly did have this power . . . .").) In addition, she claims both that Jardine transferred her to a different jobsite after she complained about Atkins and that Jardine transferred her after Atkins complained about her. (#68 ¶¶ 11, 19, 92.) Either way, plaintiff has not demonstrated that Atkins himself had the authority to transfer her.

Under step one of that framework, the plaintiff must establish a prima facie case of discrimination. Once the plaintiff establishes a prima facie case, "an inference of discrimination arises, and the burden of production shifts to the defendant to produce evidence that the challenged employment action was taken for a legitimate, non-discriminatory reason. If the employer supplies such evidence, the plaintiff is left with the burden to prove 'by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory.'"

*Tyree v. Foxx*, 835 F.3d 35, 40 (1st Cir. 2016) (quoting *Hicks v. Johnson*, 755 F.3d 738, 744 (1st Cir. 2014)).

"[A] plaintiff establishes a prima facie case by showing that (1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications." *Kosereis v. Rhode Island*, 331 F.3d 207, 212-213 (1st Cir. 2003). "The last two elements may 'vary according to the nature of the plaintiff's claim.'" *Rock v. Lifeline Sys. Co.*, No. 13-11833-MBB, 2015 U.S. Dist. LEXIS 144335, at *23 (D. Mass. Oct. 23, 2015) (quoting *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012)). "In conducting this analysis at the summary judgment stage, it is not necessary slavishly to follow the shifts in production burdens; instead, the focus is 'on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.'" *Goldstein v. Brigham & Women's Faulkner Hosp., Inc.*, 80 F. Supp. 3d 317, 325 (D. Mass. 2015) (quoting *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996)).

Plaintiff has met her prima facie case in showing that she is a member of a protected class, that she was qualified for her position as apprentice at least until she failed the exam due to the effects of the harassment, and that she was terminated from the Union. The Union states that it had a legitimate reason for terminating her membership, which was its "longstanding policy of requiring that apprentices be in good standing with the School to maintain their Union

membership." (#49 at 16.) Plaintiff counters that this reason is pretextual. (#65 at 14.) She has testified that Bowes, the Union president, told her it would be easier to "get rid" of her rather than find her a jobsite free from harassment, and that she did not need to worry about the exam. The decision to expel plaintiff from the School was made by a board that was partially comprised of Union members, including Bowes.

At summary judgment, a plaintiff "must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." *Tyree*, 835 F.3d at 35 (quoting *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir. 1998)).

> One way to show pretext is through "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without the additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons."

*Billings*, 515 F.3d at 55-56 (alteration in original) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998)). "[W]here a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Billings*, 515 F.3d at 56 (quoting *Hodgens*, 144 F.3d at 167).

A jury could reasonably infer that Bowes voted to expel plaintiff from the School because he knew it also would lead to her termination from the Union.[19] The Union's motion for summary judgment as to plaintiff's discrimination claim under Title VII is denied.

---

[19] The Union argues that Bowes' decisions as trustee of the School should not be imputed to the Union just because he was also the Union president. (#49 at 16.) Yet courts have found it reasonable to impute knowledge from an ERISA trust to a union where an individual was both a union member and trustee. *N. New Eng. Carpenters Pension Plan & Tr. v. H. P. Cummings Constr.*

5.      <u>Whether the Union Retaliated Against Plaintiff</u>.

Lastly, the Union seeks summary judgment on plaintiff's retaliation claim under Title VII

on the basis that the Union had a legitimate, non-discriminatory reason for terminating plaintiff.

(#49 at 17-18.)

"[R]etaliation is a distinct cause of action, motivated, at least in part, by a distinct intent to

punish or to rid a workplace of someone who complains of unlawful practices." *Ruffino*, 908 F.

Supp. at 1040. Under Title VII, "[t]o prove prima facie retaliation, [plaintiff] must show that she

'engaged in protected conduct,' 'suffered an adverse employment action' and that the 'adverse

action was causally connected to the protected activity.'" *Shervin v. Partners Healthcare Sys.*, 2

F. Supp. 3d 50, 61 (D. Mass. 2014) (quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir.

2009). "After [the plaintiff] establishes a prima facie case, the burden shifts to the defendant to

articulate a legitimate, non-retaliatory reason for its employment decision." *Marcus v. Am.

Contract Bridge League, Inc.*, No. 17-cv-11165-FDS, 2021 U.S. Dist. LEXIS 57205, at *99 (D.

Mass. Mar. 24, 2021). "If the defendant makes the requisite showing, 'the ultimate burden falls on

the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action

was the result of the defendant's retaliatory animus.'" *Mogilevsky v. Wellbridge Club Mgmt.*, 905

F. Supp. 2d 405, 411 (D. Mass. 2012) (quoting *Fennell*, 83 F.3d at 535).

Similar to the requirement for a claim of discrimination, at summary judgment, "a plaintiff

must do more than merely 'impugn the veracity of the employer's justification,'" and must

---

*Co.*, No. 02-cv-180, 2003 U.S. Dist. LEXIS 5923, at *27-28 (D. Me. Apr. 10, 2003) (finding it
appropriate to impute knowledge to trust where union member, who was also a trustee, received
notice (citing *United States v. Josleyn*, 206 F.3d 144, 159 (1st Cir. 2000))); *Trs. for Mich.
Carpenters Council Health Care Fund v. Superior Poured Concrete Walls, Inc.*, No. L87-9-CA5,
1989 U.S. Dist. LEXIS 17600, at *5 (W.D. Mich. Mar. 14, 1989) (stating that trustee should have
been aware of information about employer because of trustee's relationship with union).

"elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive" of discrimination. *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 25 (1st Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)).

Again, plaintiff has provided evidence to support her contention that the Union's stated reason was pretextual so as to survive summary judgment on this claim.

      6.    <u>Summary</u>.

Drawing all reasonable inferences in plaintiff's favor, she has adduced sufficient evidence to send her Title VII hostile work environment, discrimination, and retaliation claims against the Union to a jury. *See Ahmed*, 752 F.3d at 495. The Union's motion is allowed, however, as to plaintiff's claims under state law.

      F.    <u>The School's Motion for Summary Judgment</u>.

The School moves for summary judgment as to all claims against it, citing various grounds in support of its motion. (#52.) Plaintiff opposes. (#65.)

      1.    <u>Preemption of State Law Claims Under ERISA</u>.

The School argues that, as an ERISA benefit plan, plaintiff's state law claims against it are preempted by ERISA. (#52 at 11-12.)

"Section 514(a) of ERISA, 29 U.S.C. § 1144(a), pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA." *Shaw v. Delta Air Lines*, 463 U.S. 85, 91 (1983). However, "some state law claims are exempt from ERISA preemption if they are a necessary part of a federal enforcement scheme under statutes like Title VII . . . ." *Jorgensen v. Mass. Mut. Life Ins. Co.*, No. 99-cv-30172, 2001 U.S. Dist. LEXIS 19579, at *23 (D. Mass. Nov. 27, 2001). This is because "Title VII[] contemplates that state laws will

contribute to the overall federal enforcement regime. Thus, if [plaintiff's] state statutory claims targeted conduct unlawful under [Title VII], those state claims would be exempt from ERISA preemption pursuant to ERISA § 514(d)." *Tompkins v. United Healthcare of New Eng., Inc.*, 203 F.3d 90, 96-97 (1st Cir. 2000) (citation omitted); *see Shaw*, 463 U.S. at 102 (stating that preemption of state laws prohibiting conduct in line with Title VII "would frustrate the goal of encouraging joint state/federal enforcement of Title VII"); *Iwata v. Intel Corp.*, 349 F. Supp. 2d 135, 157 (D. Mass. 2004) ("Massachusetts state law is only preempted to the extent that it is not congruent with federal civil rights law. . . . Thus, [plaintiff's] state law claim . . . under section 151B[] survives, but she can only prevail on it to the extent that she proves that [defendants] violated both section 151B and some parallel federal law . . . ."). Plaintiff's state law claims, premised on violations of the same rights protected under Title VII, are therefore exempt from preemption.

2.  Whether the School Can Be Held Liable as a Labor Organization.

The School notes that it cannot be held liable under Chapter 151B, § 4(2) because it applies to "labor organizations" and not to programs like the School. (#52 at 5-6.) Plaintiff's position is that the School and Union "hold themselves out to be one entity" and so should be treated as such. (#65 at 24.)

Section 4(2) of Chapter 151B prohibits "a labor organization" from "exclud[ing] from full membership rights or [] expel[ling] from its membership" an individual because of their sex. Mass. Gen. Laws ch. 151B, § 4(2). A "labor organization" is defined as "any organization which exists and is constituted for the purpose, in whole or in part, of collective bargaining or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection in connection with employment." *Id.* § 1(3). Plaintiff does not contend that the School was formed for the purpose of engaging in collective bargaining or mediating employment

grievances as opposed to training Union members in their trade. Further, the School persuasively presents legislative history which supports excluding apprenticeship programs from the definition of "labor organization." (#52 at 8-10 (comparing definition under § 1(3) to the National Labor Relations Act's definition and noting that programs like the School are required to be separate entities from unions)); *see NLRB v. Amax Coal Co., Div. of Amax*, 453 U.S. 322, 334-338 (1981) (distinguishing ERISA programs from unions by noting the absence of collective bargaining or adjustment of grievance concerns).

Summary judgment on plaintiff's claim against the School under § 4(2), Count IV, is therefore allowed.

### 3.    "Any Person" Liability Under §§ 4(4), 4(4A).

The School also argues that it cannot be held liable under Chapter 151B, §§ 4(4) and 4(4A) because (a) the School was not responsible for an adverse employment action, and (b) it did not interfere with her rights. (#52 at 10.)

Again, to survive summary judgment on a claim of retaliation under § 4(4),

an employee must produce evidence from which a jury could infer four elements. First, there must be evidence that the employee "reasonably and in good faith believed that the employer was engaged in wrongful discrimination." Second, there must be evidence that the employee "acted reasonably in response to that belief," through reasonable acts meant "to protest or oppose . . . discrimination" (protected activity). Third, there must be evidence that the employer took adverse action against the employee. Finally, there must be evidence that the adverse action was a response to the employee's protected activity (forbidden motive).

*Verdrager*, 50 N.E.3d at 800 (citations omitted) (quoting *Pardo*, 841 N.E.2d at 707).

Although, as the School maintains, expulsion might not have been an adverse employment action in that the School was not plaintiff's employer, expulsion carried with it more weight than mere dismissal from the program. For plaintiff, expulsion meant automatic termination from the Union, as well as the loss of her position with East Coast Slurry. In any case, "a claim of retaliation

33

under G.L. c. 151B, § 4(4) or (4A) . . . is satisfied merely by a showing that some detrimental action occurred in response to the employees' assertion of protected rights." *Cadigan v. Align Tech., Inc.*, No. 19-cv-11462-ADB, 2020 U.S. Dist. LEXIS 118376, at *26 (D. Mass. July 7, 2020) (quoting *King v. City of Bos.*, 883 N.E.2d 316, 327 n.11 (Mass. App. Ct. 2008)); *see Hernandez-Torres v. Intercontinental Trading*, 158 F.3d 43, 47 (1st Cir. 1998) (noting that Title VII similarly "encompasses a variety of adverse employment actions, including demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees"). Given this expansive interpretation, expulsion is certainly a "detrimental action" for purposes of § 4(4).

As discussed above with regard to Suffolk's arguments against liability under § 4(4A), "[t]o establish a claim for interference under c. 151B, § 4(4A), . . . [plaintiff] must show that [defendants] interfered with [her] rights in deliberate disregard of those rights. 'Deliberate disregard requires an intent to discriminate.'" *Runyon*, 2015 WL 1276825, at *6 (quoting *Canfield*, 578 F. Supp. 2d at 242). The School frames the alleged interference in the context of its expulsion of plaintiff from the program, and disputes that plaintiff had any right under § 4(4A) to remain in the program. (#52 at 10-11.) Instead, the right at issue is plaintiff's right to be free from sex-based discrimination. She has alleged that Bowes, a trustee of the School, made comments to her and took discriminatory actions against her on the basis of her sex, in deliberate disregard of her right to be free from sex-based discrimination.

Plaintiff's claims under §§ 4(4) and 4(4A) survive the School's challenges on these grounds.

     4.     <u>Whether the School Created a Hostile Work Environment</u>.

The School maintains that plaintiff cannot succeed on her hostile work environment claims under Title VII or Chapter 151B. (#52 at 13-16.)

The court has outlined the elements of a hostile work environment claim under Title VII above with reference to the Union's motion for summary judgment. "[T]he standards applicable to a Title VII claim charging hostile environment are essentially 'analogous' to the standards under chapter 151B." *Bourbeau*, 445 F. Supp. 2d at 111 (quoting *Brissette v. Franklin County Sheriff's Office*, 235 F. Supp. 2d 63, 84 (D. Mass. 2003)).

     a.     <u>Severe or Pervasive Element</u>.

The School, like the Union, argues that the conduct plaintiff complains of was neither severe nor pervasive. (#52 at 14-15.)

Plaintiff, as an apprentice with the School, was assigned to a worksite where she received training from Atkins and Noyes, and where Bowes—in his role as either School trustee or Union president—visited to follow up on her complaints. Plaintiff has propounded evidence that all three engaged in repeated discriminatory conduct over the course of one year. For the reasons discussed above in reference to the Union, a reasonable jury could find that the conduct was either severe or pervasive. *See Gorski*, 290 F.3d at 474; *Dacunha*, 2020 U.S. Dist. LEXIS 158056, at *19.

     b.     <u>Objectively and Subjectively Offensive Element</u>.

The School also argues that the conduct was neither objectively nor subjectively offensive. (#52 at 14-15.) For the reasons discussed above as to the Union, this is a question that a jury must resolve.

c.      Employer Liability Element.

Like the Union, the School claims that it cannot be held liable for harassment that occurred at plaintiff's jobsite with East Coast Slurry. (#52 at 15-16.)

For the reasons discussed with regard to plaintiff's Title VII claim against the Union, the court has already found that Atkins and Noyes were not her supervisors. However, in reaching that finding, the court relied on the Supreme Court's holding in "*Vance* [which] interpreted Title VII, not Chapter 151B. Chapter 151B requires no direct supervisory relationship between the harasser and the victim, and extends liability for the employer's 'agents.'" *Romero v. McCormick & Schmick Rest. Corp.*, No. 18-cv-10324-IT, 2020 U.S. Dist. LEXIS 50699, at *14 (D. Mass. Mar. 24, 2020). Instead, under Chapter 151B, the inquiry is whether "the putative supervisor . . . [has] 'some modicum of authority,' such as the authority to assign work, impose particularly exacting scrutiny, or a responsibility to protect other workers from sexual harassment." *Id.* (quoting *Noviello*, 398 F.3d at 96).

Plaintiff states that Atkins and Noyes, as Union members who were assigned to work with her on the jobsite, gave her direction and helped to train her. Despite drawing all reasonable inferences in plaintiff's favor, however, plaintiff has provided insufficient evidence to suggest that Atkins and Noyes were the School's agents. As for Bowes, he was both the Union president and a trustee of the School. He voted to expel her from the School and delivered the news of her expulsion, termination, and firing. For the reasons discussed above as to the Union, plaintiff has established the School's liability for purposes of her hostile work environment claim.

5.      Whether the School Discriminated Against Plaintiff.

The court has already outlined the requirements for establishing a claim of discrimination under Title VII. *See Kosereis*, 331 F.3d at 212-213. "The analysis of a gender discrimination claim

36

is essentially the same under the State and Federal statutes." *Rock*, 2015 U.S. Dist. LEXIS 144335, at *23 (quoting *Beal v. Board of Selectmen of Hingham*, 646 N.E.2d 131, 138 n.5 (Mass. 1995)); *see Bourbeau*, 445 F. Supp. 2d at 114.

The School accepts, for purposes of summary judgment, that plaintiff has presented her prima facie case as to three elements, but argues that she cannot demonstrate that she was qualified to remain at the School. (#52 at 17.) In any event, even conceding for purposes of summary judgment that plaintiff has made her prima facie case, the School puts forward plaintiff's failure to complete the School's requirements (passing the 4B Hoisting examination and complying with her disciplinary agreement) as a legitimate reason for her termination. (#52 at 16-18.) The School also notes that plaintiff cannot support her proffered pretext through comparison to Gates, another apprentice who was allowed to repeat a year of the program, because Gates—unlike plaintiff— was not subject to a disciplinary agreement. *Id.* at 18.

"A plaintiff can demonstrate that an employer's stated reasons are pretextual 'in any number of ways,' including by producing evidence that plaintiff was treated differently from similarly situated employees." *Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008) (quoting *Kosereis*, 331 F.3d at 214). "To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer.'" *Id.* (quoting *Kosereis*, 331 F.3d at 214). "The comparison cases 'need not be perfect replicas,' but they must 'closely resemble one another in respect to relevant facts and circumstances.'" *Id.* (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)). Without having a disciplinary agreement in place prior to the August 2019 board meeting, as plaintiff had, Gates does not "closely resemble" plaintiff's circumstances and is not similarly situated to her.

Plaintiff is not limited to a differential treatment argument as to pretext, however. *Garcia*, 535 F.3d at 31. Again, at summary judgment, a plaintiff "must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination." *Tyree*, 835 F.3d at 35 (quoting *Dichner*, 141 F.3d at 30). Plaintiff has met that burden here, where a jury could determine that plaintiff's termination from the School was a sham to "get rid" of her because its trustee, Bowes, believed plaintiff's looks would continue to cause problems at jobsites.

Although the School insists that dismissal was consistent with its policies, (#52 at 17), plaintiff's evidence demonstrates that her disciplinary agreement did not require expulsion for noncompliance, and that the School's Regulations and Policies similarly did not mandate expulsion but allowed the option of having students repeat a year. Plaintiff also cites past favorable reviews to suggest that, aside from the minor disciplinary agreement, she was in good standing with the School before she failed the 4B Hoisting examination. Lastly, she argues that she failed the exam because of the stress she was under because of the ongoing harassment. Drawing all reasonable inferences in plaintiff's favor, a jury could determine that, where expulsion was permissive, and one of the School's trustees suggested that it would be easier to "get rid" of plaintiff, her expulsion for failure to pass the 4B Hoisting examination was pretextual. *See Billings*, 515 F.3d at 56 (stating that "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." (quoting *Hodgens*, 144 F.3d at 167)).

6.      Whether the School Retaliated Against Plaintiff.

Finally, the School argues that it did not retaliate against plaintiff when it expelled her but, again, had a legitimate reason to do so. (#52 at 19-20.)

Under both Title VII and Chapter 151B, §4(4), "[t]o prove prima facie retaliation, [plaintiff] must show that she 'engaged in protected conduct,' 'suffered an adverse employment action' and that the 'adverse action was causally connected to the protected activity.'" *Shervin*, 2 F. Supp. 3d at 61 (quoting *Fantini*, 557 F.3d at 32) (citing *Mole v. University of Massachusetts*, 814 N.E.2d 329 (Mass. 2004)).[20] The School concedes, for purposes of summary judgment, that plaintiff's complaints were protected and that she suffered an adverse employment action. (#52 at 19.) It disputes, however, any causal connection between her complaints and her expulsion. *Id.*

Plaintiff has stated that she experienced harassment both before and after failing the 4B Hoisting examination and that she complained about the harassment both before and after she failed the exam. Significantly, she states that she complained about the harassment and cited her past complaints to the School's board of trustees after she failed the examination and before they expelled her. She has established a prima facie case of retaliation. Again, the School's proffered, non-discriminatory reason for expelling her is that she did not complete a required element of the School's program—passing the 4B Hoisting exam—in violation of a previous disciplinary agreement. (#52 at 20.) For the same reasons discussed above as to plaintiff's discrimination claim against the School, her offering on pretext is sufficient to bring the case before a jury and to defeat summary judgment.

---

[20] "Massachusetts . . . discrimination law deviates from federal law in at least one respect: it allows a plaintiff who establishes a prima facie case and 'proves that at least one of the reasons given by the defendant was pretextual' to survive a motion for judgment as a matter of law." *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 30 n.2 (1st Cir. 2007) (quoting *Joyal v. Hasbro, Inc.*, 380 F.3d 14, 17 (1st Cir. 2004)).

V.   Conclusion.

For the reasons stated, Suffolk's motion for summary judgment (#57) is ALLOWED, the Union's and School's motions for summary judgment are ALLOWED in part and DENIED in part (##48, 51), and East Coast Slurry's motion (#55) is DENIED.


March 1, 2022                                     /s/ M. Page Kelley
                                                 M. PAGE KELLEY
                                                 United States Magistrate Judge