UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VIRGINIA HUSSEY,
   Plaintiff,

v.

CIVIL ACTION NO. 20-11511-MPK

EAST COAST SLURRY CO., LLC;
INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 4;
and HOISTING AND PORTABLE
ENGINEERS APPRENTICESHIP AND
TRAINING PROGRAM aka HOISTING
AND PORTABLE ENGINEERS
APPRENTICESHIP & TRAINING FUND,
aka HOISTING AND PORTABLE
ENGINEERS APPRENTICESHIP &
TRAINING CENTER,
   Defendants.

**<u>ORDERS ON EVIDENTIARY DISPUTES</u>**

KELLEY, U.S.M.J.

      Jury trial in this gender discrimination, retaliation, and sexual harassment case is scheduled

for March 13, 2023. In this order the court rules on motions in limine ##88, 92, 96, 98, 100, 116,

118, and 119. The court will hear argument on #90 at the final pretrial conference.

I. <u>Plaintiff's Motions in Limine to Exclude Substance Use and Child Custody Evidence (##118, 119), and East Coast Slurry's Motion in Limine to Exclude Medical Records (#100).</u>

Plaintiff is seeking to introduce into evidence over seven hundred pages of medical records (Exhibit E, *see* #133-1 (joint pretrial memorandum) at 3). Defendant East Coast Slurry Co., Inc. ("East Coast Slurry") moves to exclude the medical records. (##100, 101.) Defendants International Union of Operating Engineers, Local 4 ("the Union") and Hoisting and Portable Engineers Apprenticeship and Training Program ("the School") join in the motion to exclude. (#124.)

Plaintiff argues that the medical records are relevant to her claim for emotional damages, *see* #126 at 5-6; they are business records admissible without testimony under Fed. R. Evid. 803(6) and 902(11), *see* #126 at 6-7; and hearsay within the medical records is admissible under Fed. R. Evid. 803(6) or 803(3) (then-existing mental, emotional, or physical condition), 803(4) (statement made for purposes of medical diagnosis or treatment), or 807 (residual exception), *see* #126 at 2-4, 8.

Plaintiff apparently anticipates redacting the medical records because they refer to her history of drug use and treatment, as well as to child custody issues, and plaintiff is separately seeking to exclude such evidence as irrelevant and unfairly prejudicial under Fed. R. Evid. 403. (##118, 119.) The Union and School argue that substance abuse and child custody evidence is relevant to liability and emotional damages. (#120.) [1]

Defendants will presumably present evidence at trial that plaintiff was not expelled from the School (leading to her termination from the Union and East Coast Slurry) because of her gender

---

[1] East Coast Slurry also opposes exclusion of substance use and child custody evidence. (##132, 135.)

or because she reported sexual harassment by coworker Bobby Atkins.[2] According to defendants, plaintiff was expelled because she did not pass a hoisting exam required for the operating engineer apprenticeship program. *See*, *e.g.*, #52 (School's summary judgment memorandum) at 16-17; #133 at 7.

Plaintiff will presumably argue pretext. In addition, plaintiff will seek to attribute her performance on the hoisting exam to the stress from the alleged sexual harassment. *See*, *e.g.*, #29 (amended complaint) at ¶51; #65 (plaintiff's summary judgment opposition) at 5, 14-15, 19; #133 at 3.

The Union and School argue that if plaintiff argues that the stress from the alleged sexual harassment caused her to perform poorly on the hoisting exam, then defendants should be able to offer evidence that she performed poorly on the hoisting exam because of other stressors. (#120 at 3-4.) Moreover, the Union and School argue that plaintiff has put her emotional condition at issue by seeking emotional damages, and defendants should be able to explore alternative or contributing stressors. *Id.*

The parties have not submitted Exhibit E, so the court's rulings are necessarily provisional. Yet the court fails to see the relevance of the medical records related to things like ear infections and knee pain, *see* ##100 at 1, 133 at 40 (East Coast Slurry's proffers), or from 2016. Plaintiff must limit the medical records to the relevant conditions, such as PTSD, anxiety, and depression, and to the relevant time period.

Plaintiff proffers that she participated in drug testing and that no connection has ever been made between drug use and her expulsion. (#118 at 2.) But there is case law supporting the admission of substance use evidence "to disprove the scope of [a] plaintiff's causally-related

---

[2] Plaintiff also alleges sexual harassment by coworker Henry Noyes, as well as misconduct by Michael Bowes, the Union president and a School trustee.

damages*." Eaton v. Hancock Cty.*, #08-cv-00370-JAW, 2011 WL 2491370, at *5 (D. Me. June 22, 2011) (citing *Orlowski v. Eriksen*, #07 C 4015, 2019 WL 2366050, at *2 (N.D. Ill. Jul. 31, 2009) ("To be sure, central to Plaintiff's claims for damages is that, as a result of the incidents that occurred on October 4, 2005, he suffered 'loss of sleep, nightmares, loss of appetite, social withdrawal, and weight loss as a result of his mental anguish, including anxiety.' Should Defendant be found liable, it will then become necessary for the jury to determine which, if any, of these injuries were proximately caused by Defendant's wrongful conduct. In order for the jury to do so, it must be informed of other potential causes of Plaintiff's injuries"); *see Patton v. Forest River, Inc.*, #18-cv-419 DRL-MGG, 2020 WL 9349541, at *1 (N.D. Ind. Sept. 16, 2020) (and cases collected). Plaintiff does not cite any case law in support of her position. *See* ##118, 119. Defendants will be permitted an "opportunity to lay a foundation and link its evidence close enough to the relevant period of emotional harm as to be admissible." *Patton*, 2020 WL 9349541, at *2.

The Union and School have made a specific proffer linking a child support issue to the relevant period of emotional harm. *See* #120-3 (documents pertaining to plaintiff's filing of state civil contempt complaint allegedly related to child's father's non-payment of support). Defendants will be permitted an opportunity to lay a foundation. Again, plaintiff cites no case law, and her argument that the jury will draw adverse inferences because of "societal beliefs," *see* #119 at 2, is not persuasive. The court will consider giving an appropriate instruction to counter any prejudicial effects of "societal beliefs" if plaintiff wants to propose one.

Finally, the court notes that plaintiff, as the party seeking admission, bears the burden of establishing that the medical records and the hearsay within the medical records are admissible. *United States v. Bartelho*, 129 F.3d 663, 670 (1st Cir. 1997). East Coast Slurry proffers that some

of the medical records include accusatory statements by plaintiff against defendants. (#100 at 2.)
If plaintiff seeks to admit such statements under Fed. R. Evid. 803(4), for instance, she must
establish that (1) the statements were made for purposes of diagnosis or treatment; (2) the
statements were about (i) medical history (ii) or past or present symptoms, pain, or sensations, or
(iii) about the inception or general character of the cause or external source (3) insofar as they are
reasonably pertinent to diagnosis or treatment. *Danaipour v. McLarey*, 386 F.3d 289, 296-297 (1st
Cir. 2004). Plaintiff's motive to promote treatment or diagnosis "is the factor crucial to reliability."
*Id.* at 298.

Plaintiff's motions to exclude substance use and child custody evidence (##118, 119) and
East Coast Slurry's motion to exclude medical records (#100) are **DENIED** without prejudice.
After plaintiff limits the medical records to the relevant medical conditions and time period, the
parties must confer further. If disputes remain, the parties may raise them with the court outside
the jury's presence.

II. <u>East Coast Slurry's Motion in Limine to Exclude Late-Disclosed Photos (#98)</u>.

    A. <u>Background</u>.

Plaintiff is seeking to introduce "Break Room photos" (Exhibit A, *see* ##133-1 at 3, 98-1
at 1-3) and "Photos of Bobby Atkins after they said he left" (Exhibit D, *see* ##133-1 at 3, 98-1 at
4-7). East Coast Slurry moves, under Fed. R. Evid. P. 26(e)(1) and 37(c)(1), to exclude the Atkins
photographs, which were not produced in discovery. (##98, 99.) The Union and School join.
(##123, 141.) Plaintiff opposes. (#139.)

Plaintiff attests that, early in the litigation, she conducted an "exhaustive" search of her cell
phone by "manually scrolling" through "thousands" of photographs. (#139-1 at ¶¶2, 3). From her
time as an operating engineer apprentice, she had "dozens" of photographs of jobsites, which she

took "to memorialize for [herself] the unique experience of working on jobsites, such as some of the largest digs since The Big Dig 172ft. . . ." *Id*. at ¶4.

On August 6, 2022, plaintiff was searching her cell phone for reasons unrelated to the litigation and found the photographs at issue, which were taken on April 4, 2019. (#139-1 at ¶¶5-6, 10.) "Upon close inspection," plaintiff identified one of the two men shown (in Exhibit D) as Atkins. She "immediately" notified her attorneys about the photographs and forwarded them. *Id*. ¶¶8-9.

Plaintiff denies intending to capture the two men in the photographs and denies intending to file a lawsuit at the time the photographs were taken on April 4, 2019. (#139-1 at ¶¶7, 10.)

East Coast Slurry proffers that the photographs were identified on plaintiff's list of trial exhibits on August 19, 2022 and produced on August 27. (#99 at 2); #139 at 1 (plaintiff's proffer). The Union and School proffer, with support, that the alleged Atkins photographs were actually produced on September 28, 2022, after counsel for the Union and School asked former lead counsel for plaintiff about the reference to "Photos of Bobby Atkins after they said he left" on plaintiff's list of trial exhibits. (##141 at 2, #141-1 at 1.) Plaintiff's former lead counsel wrote: "Attached. They weren't produced in discovery." *Id*.

The Union and School proffer that the breakroom photographs were produced later on September 28, 2022. (##141 at 2, #141-2 at 1.)

B. Law.

Fed. R. Civ. P. 26 requires that a party, "without awaiting a discovery request," provide the other parties with "a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession,

custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii).

Fed. R. Civ. P. 26 also requires that the disclosing party supplement or correct a Rule 26(a) production "in a timely manner" if the party learns that the production was materially incomplete or incorrect and that the additional or corrective information has not otherwise been made known. Fed. R. Civ. P. 26(e)(1).

Fed. R. Civ. P. 37 provides that:

If a party fails to provide information. . .as required by Rule 26(a) or (e), the party is not allowed to use that information. . .to supply evidence. . .at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions. . . .

Fed. R. Civ. P. 37(c)(1).

The disclosing party bears the burden of establishing that a late disclosure was "substantially justified" or is "harmless." *Alves v. Mazda Motor of Am., Inc.*, 448 F. Supp. 2d 285, 293 (D. Mass. 2006); *see Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 200 (D. Mass. 2015). In determining whether a late disclosure was "substantially justified" or is "harmless," the court considers several factors, including (1) the history of the litigation; (2) the disclosing party's need for the evidence; (3) the disclosing party's justification for the late disclosure; (4) the opposing party's ability to overcome the late disclosure, i.e., the surprise and prejudice from the late disclosure; and (5) the impact of the late disclosure on the court's docket. *Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 78 (1st Cir. 2009).

C. <u>Discussion</u>.

    1. <u>The breakroom photographs</u>.

Plaintiff develops no argument at all concerning the relevance of these particular breakroom photographs or her need for them. *See* ##139, 139-1. Accordingly, the court excludes Exhibit A.

    2. <u>The alleged Atkins photographs</u>.

The court accepts the Union and School's proffer regarding the production of the alleged Aktins photos. There is an unexplained fifty-three-day gap between discovery (August 6, 2022) and production (September 28, 2022).[3] The court therefore rejects plaintiff's argument, *see* #139 at 2-3, that she actually complied with Fed. R. Civ. P. 26(e)(1). In addition, production occurred months after discovery closed, and just forty-one days before trial (then scheduled for November 8, 2022). (##40, 41, 82).

Plaintiff does not say how many "thousands" of photographs are on her cell phone or how many "dozens" of those photographs depict jobsites. She also does not say whether she might have lessened her load by "manually scrolling" through only those photographs taken when she was an operating engineer apprentice. *See* #139-1. At any rate, "even good-faith mistakes can lack a substantial justification. . . ." *Bartlett v. Mutual Pharm. Co., Inc*., #08-cv-358-JL, 2009 WL 3614987, at *5 (D. N.H. Nov. 2, 2009) (citing *Thibeault v. Square D Co*., 960 F.2d 239, 245 & n.4 (1st Cir. 1992) (under Fed. R. Civ. P. 26(e), "preclusion can be imposed in response to a party's subversion of the trial process, even if the responsible party was guilty of laxity rather than bad faith," although good faith is relevant in choosing sanction); *see Ansolabehere v. Dollar Gen.*

---

[3] If the alleged Atkins photos were produced on August 27, 2022, there is still an unexplained twenty-one-day gap.

*Corp.*, #19-cv-01017-JLT, 2021 WL 4846795, at *5 (E.D. Cal. Oct. 18, 2021) (inadvertence is not substantial justification).

The relevance of the alleged Atkins photographs is clear.[4] East Coast Slurry will presumably argue that its response to plaintiff's report of Atkins' behavior was adequate where it removed Atkins from the jobsite on March 9, 2019, and terminated him on March 29. *See, e.g.,* #58 (East Coast Slurry's statement of material facts) at 3; #133 at 4-5. Plaintiff will presumably argue that East Coast Slurry's response was inadequate, as evidenced by the photographs.[5]

Plaintiff's need for the alleged Atkins photographs is not as clear. Plaintiff asserts that exclusion will "disproportionately impact" her. (#139 at 5.) Yet she does not attest that she has no memory of seeing Atkins on the jobsite after March 9, 2019. *See* #139-1. Her deposition testimony, in 2021, suggests that she perhaps had some memory of seeing Atkins on the jobsite after March 9, 2019, before discovering the photographs.[6]

---

[4] Plaintiff does not say which of the two men she identified in Exhibit D as Atkins. *See* #139-1 at ¶8. In the first photograph, the two men have their backs turned to the camera. (#98-1 at 4). In the rest, the profile of the man who is farther away from the camera is visible, while the man who is closer to the camera still has his back turned to it. *Id.* at 5-6. As of February 10, 2023, plaintiff's counsel apparently had not informed even defense counsel which of the two men in Exhibit D plaintiff believes to be Atkins. (#141 at 2.)

[5] Counsel for the Union and School suggest that the alleged Atkins photos may have been taken on March 23, not April 4, 2019. (#141 at 1 n.1.)  Either way, they post-date the alleged March 9 removal date.

[6] Plaintiff highlights her deposition testimony in arguing that defendants are not surprised by the photographs. Plaintiff was asked if she had "any information to suggest" that Atkins had not been removed from the jobsite on March 9, 2019. She answered:

> No. But I am kind of looking into that, because I feel like it was maybe a little later than that; however, I'm not 100 percent sure.

(#68-1 at 216.) According to plaintiff, the answer put defendants on notice that she would challenge the alleged March 9 removal date. (#139 at 3-4.) But the answer was negative: "No[,]" plaintiff did not have "any information," so it did not put defendants on notice of the photographs.

The court is not convinced that defendants are unable to overcome the prejudice from the late disclosure. Trial was re-scheduled from November 8, 2022 to March 13, 2023, meaning defendants have had four additional months to prepare. Because of the late disclosure, defendants were not able to question plaintiff at her deposition about the circumstances under which the photographs were taken, the date, and why she took them. (#99 at 2.) Yet defendants have not moved to re-open discovery, and they will be able to question plaintiff at trial about the photographs. The court agrees with defendants that this questioning is important "in ascertaining plaintiff's awareness of her cause of action," *see* #99 at 2, but the jury is deciding whether plaintiff's claims are time-barred.[7] The court does not perceive defendants' lost earlier opportunity to be especially harmful, and it may well be helpful to them.

If they have a good faith basis to do so, defendants may, of course, challenge plaintiff's identification of Atkins in the photos. Moreover, Atkins may be asked about the photographs.

It is a close call but, on balance, the court is unable to find that exclusion of the alleged Atkins photographs is appropriate. The court is, however, inclined to consider instructing the jury regarding the late disclosure.

D. <u>Summary</u>.

East Coast Slurry's motion to exclude late-disclosed photographs (#98) is **ALLOWED** in part and **DENIED** in part. Exhibit A is excluded; Exhibit D is not.

If they still have not, plaintiff's counsel must, within twenty-four hours of the issuance of this order, inform defense counsel which of the two men in Exhibit D plaintiff believes to be

---

[7] On summary judgment, the court ruled that the jury will decide whether the continuing violation and equitable tolling doctrines apply. (#75 at 12-15.) As discussed below, the court denies the Union and School's motion in limine to preclude an equitable tolling argument.

Atkins. Prior to the charge conference, defendants may propose a jury instruction for the court's consideration.

III. The Union and School's and East Coast Slurry's Motions in Limine to Exclude Expert Evidence (##88, 96).

The parties do not appear to dispute that, after her expulsion from the School and termination from the Union and East Coast Slurry in August 2019, plaintiff was unemployed. In July 2021, plaintiff began a sheet metal apprenticeship, and remains in that program now.

Plaintiff is seeking to prove economic loss as a result of her expulsion and termination, including front pay. *See*, *e.g.*, #87 (plaintiff's proposed jury instructions) at 48-49; #133 at 5. The Union and School move to exclude the reports and testimony of a rehabilitation counselor, Dr. Amy Vercillo, and an economist, Dr. Thomas Barocci. (##88, 89, 122.) East Coast Slurry also moves to exclude the expert evidence. (##96, 97.) Plaintiff opposes. (##125, 129.)

Neither report is clear. The court has reviewed the reports, as well as the attachments to Dr. Barocci's, closely. From the court's review, a number of defendants' criticisms of the experts' work appear unfounded.

A. Deciphering the expert evidence.

1. Dr. Vercillo.

In her report, Dr. Vercillo opines, from United States Department of Labor, Bureau of Labor Statistics data for Massachusetts in May 2020,[8] as follows: If plaintiff had not been expelled from the School, she would have completed the operating engineers apprenticeship in 2021 and would have been eligible to earn between the mean of the annual wage for operating engineers

_____

[8] Here, "the DOL data."

(per the DOL data, $74,490)[9] and the 90th percentile of the annual wage for operating engineers

(per the DOL data, $110,320) over a work life expectancy of 32 years. (#88-1 at 6.)

Presently, "[i]n a best-case scenario," plaintiff will complete her sheet metal apprenticeship

in 2026 and will be eligible to earn "at least" the mean annual wage for sheet metal workers (per

the DOL data, $66,160) over a work life expectancy of 27 years. (#88-1 at 7.)

Splitting the difference between the mean and 90th percentile of the annual wage for

operating engineers ($92,405)[10] and comparing that figure to the mean annual wage for sheet metal

workers ($66,160), Dr. Vercillo calculates a 28% decrease in earning capacity. (#88-1 at 8.)

    2. Dr. Barocci.

Relying on Dr. Vercillo's report, in his report, Dr. Barocci estimates plaintiff's economic

loss as a range of $556,373 to $1,467,086. (#88-2 at 9.)

The high end of the range is based upon the first of two scenarios:[11] If plaintiff had not

been expelled from the School, she would have earned percentages of the 90th percentile of the

annual wage for operating engineers ($110,320) in 2019-2021. Over the rest of her work life

---

[9] Dr. Vercillo refers to the $74,490 figure both as the mean annual wage for operating engineers and the 50th percentile of the annual wage for operating engineers. (#88-1 at 6, 7.) Dr. Barocci refers to the $74,490 figure as the 50th percentile of the annual wage for operating engineers. (#88-2 at 7.) Per the DOL data, the mean annual wage for operating engineers was $74,490, while the 50th percentile of the annual wage for operating engineers was $67,530. https://stats.bls.gov/oes/2020/may/oes472073.htm (last visited February 20, 2023). A 50th percentile is not a mean; it is a median. https://www.bls.gov/oes/oes_perc.htm (last visited February 20, 2023). Defendants do not raise this discrepancy.

[10] $110,320 minus $74,490 equals $35,830, divided by two equals $17,915, added to $74,490 equals $92,405. This is not the 75th percentile of the annual wage for operating engineers. *See* #88-1 at 6; *see also* https://stats.bls.gov/oes/2020/may/oes472073.htm (last visited February 20, 2023).

[11] Here, as in Dr. Barocci's report, the "90th percentile" scenario.

expectancy (a total of 24.13 years), plaintiff would have earned the full 90th percentile from 2022-2042 and a fraction of the 90th percentile in 2043.

The low end of the range is based upon the second of two scenarios:[12] If plaintiff had not been expelled from the School, she would have earned percentages of the mean of the annual wage for operating engineers ($74,490) in 2019-2021. Over the rest of her work life expectancy (a total of 24.13 years), she would have earned the full mean from 2022-2042 and a fraction of the mean in 2043.

In the 90th percentile and mean scenarios, Dr. Barocci accounts for plaintiff's present sheet metal apprenticeship and future employment as a sheet metal worker but calculates mitigating earnings from the mean of the annual wage for sheet metal workers ($66,160).

> a. The high end of the range.

> > i. Foregone earnings: operating engineer.

Wages. The following is drawn mostly from Dr. Barocci's table titled "Foregone Earnings 1," *see* #88-2 at 13, and his worksheet titled "Relevant Wage Data," *see* #88-2 at 12:

Using the 90th percentile of the annual wage for operating engineers ($110,320) -- that is to say, using the DOL data -- Dr. Barocci sets the foregone wage for "Worklife year"[13] 1 at (roughly) 80% of the 90th percentile, or $88,211; for WLY 2 at (roughly) 90% of the 90th percentile, or $99,303; and, for WLY 3 at (roughly) 99% of the 90th percentile, or $108,949. (#88-2 at 12, 13.)[14]

---

[12] Here, the "mean" scenario; in Dr. Barocci's report, the "50th percentile" scenario.

[13] Here, "WLY."

[14] 79.96% of $110,320 is $88,211; 90.01% of $110,320 is $99,303; and, 98.76% of $110,320 is $108,949. The court is unclear as to the source of the (roughly) 80%, 90%, and 99%, although it infers that Dr. Barocci reduces the 90th percentile of the annual wage for operating engineers in WLY 1, WLY 2, and WLY 3 because plaintiff would still have been an operating engineer

Dr. Barocci sets the foregone wages for WLY 4 to WLY 24 at the full 90th percentile of the annual wage of operating engineers, or $110,320. (#88-2 at 13.)

Dr. Barocci sets the foregone wage for WLY 24.13 at $14,762, the fraction of the 90th percentile. (#88-2 at 13.)

Benefits.[15]  Dr. Barocci sets the foregone benefits for WLY 1 to WLY 24.13 at 41.51% of the foregone wages for WLY 1 to WLY 24.13. (#88-2 at 13.)[16]

Dr. Barocci identifies the Bureau of Labor Statistics as the source of the 41.51%. (#88-2 at 7-8 & n.4).

Unadjusted total. Dr. Barocci adds the foregone wage for each WLY to the foregone benefits for each WLY, and then all of the foregone wages-plus-benefits, resulting in unadjusted total foregone earnings. (#88-2 at 13.)

Adjusted total. Dr. Barocci appears to make two adjustments to the total foregone earnings. Defendants do not address them, so the court notes only that Dr. Barocci appears to reduce the total foregone earnings to reflect the present value as of the date of plaintiff's expulsion, i.e. August 2019, and then appears to increase that figure to reflect the present value as of the date of plaintiff's filing suit, i.e. August 2020. (#88-2 at 8, 9, 13.)

To calculate the high end of his range, Dr. Barocci uses the present value of foregone earnings as of August 2020 -- $2,804,072. (#88-2 at 9.)

ii. Mitigating earnings: sheet metal worker.

---

apprentice then. *But see* #50-8 (Local 4 (operating engineer) Collective Bargaining Agreement) at 16-17 (setting out different apprentice percentages). Defendants do not address these percentages.

[15] More on Dr. Barocci's inclusion of benefits in his calculations below.

[16] E.g., for WLY 4 to WLY 24, the foregone benefits are $45,793, *see* #88-2 at 13, and 41.51% of $110,320 is $45,793.83.

<u>Wages</u>. The following is drawn mostly from Dr. Barocci's table titled "Mitigating Earnings," *see* #88-2 at 15, and his worksheet titled "Relevant Wage Data," *see* #88-2 at 12:

Dr. Barocci sets the mitigating wages for WLY 1 and WLY 2 at $0, presumably because plaintiff was unemployed. (#88-2 at 7, 15.)

Using the mean annual wage for sheet metal workers ($66,160) – i.e. using the DOL data – Dr. Barocci sets the mitigating wage for WLY 3 at 42% of the mean, or $27,787; for WLY 4 at 47% of the mean, or $31,095; for WLY 5 at 52% of the mean, or $34,403; for WLY 6 at (roughly) 63% of the mean, or $41,350; and, for WLY 7 at 80% of the mean, or $52,928. (#88-2 at 12, 15.)[17]

Dr. Barocci sets the mitigating wages for WLY 8 to WLY 24 at the full mean annual wage of sheet metal workers, or $66,160. (#88-2 at 15.)

Dr. Barocci sets the mitigating wage for WLY 24.13 at $8,853, the fraction of the mean. (#88-2 at 15.)

<u>Benefits</u>. Dr. Barocci sets the mitigating benefits for WLY 1 and WLY 2 at $0. (#88-2 at 15.)

Dr. Barocci sets the mitigating benefits for WLY 3 to WLY 24.13 at (roughly) 41.51% of the mitigating wages for WLY 3 to WLY 24.13. (#88-2 at 15.)[18]

---

[17] 42% of $66,160 is $27,787.20; 47% of $66,160 is $31,095.20; 52% of $61,160 is $34,403.20; 62.5% of $66,160 is $41,350; and 80% of $66,160 is $52,982. Dr. Barocci explains in his report that he "adjust[s] for the [sheet metal] apprenticeship," *see* #88-2 at 7, and although he does not expressly say so, it is clear to the court that the Local 17 (sheet metal worker) Collective Bargaining Agreement is the source of the 42%, 47%, 52%, 63%, and 80%. That CBA sets out apprenticeship percentages of 42% (probationary), 47% (second year), 52% (third year), 60% (first half of fourth year), 65% (second half of fourth year), 75% (first half of fifth year), and 85% (second half of fifth year).  *See* #88-3 (Local 17 (sheet metal worker) Collective Bargaining Agreement) at 10.

[18] E.g., for WLY 8 to WLY 24, the mitigating benefits are $27,462, *see* #88-2 at 15, and 41.51% of $66,160 is $27,463.01.

Unadjusted total. Dr. Barocci adds the mitigating wage for each WLY to the mitigating benefits for each WLY, and then all of the mitigating wages-plus-benefits, resulting in unadjusted total mitigating earnings. (#88-2 at 15.)

Adjusted total. Dr. Barocci appears to make the same two adjustments to the total mitigating earnings that he did to the total foregone earnings, that is, reducing the total mitigating earnings to reflect the present value as of August 2019, and then increasing that figure to reflect the present value as of August 2020. (#88-2 at 8, 9, 15.)

To calculate the high end of his range, Dr. Barocci uses the present value of mitigating earnings as of August 2020 -- $1,336,985. (#88-2 at 9.)

### iii. Result.

The high end of Dr. Barocci's range -- $1,467,086 -- is (roughly) the difference between the present value of foregone earnings as of August 2020 and the present value of mitigating earnings as of August 2020. (#88-2 at 9.)[19]

### b. The low end of the range.

#### i. Foregone earnings: operating engineer.

Wages. The following is drawn mostly from Dr. Barocci's table titled "Foregone Earnings 2," see #88-2 at 14, and his worksheet titled "Relevant Wage Data," see #88-2 at 12:

Using the mean of the annual wage for operating engineers ($74,490) -- that is to say, using the DOL data -- Dr. Barocci sets the foregone wage for WLY 1 at (roughly) 80% of the mean, or

---

[19] $2,804,072 minus $1,336,985 actually equals $1,467,087.

$59,562; for WLY 2 at (roughly) 90% of the mean, or $67,051; and, for WLY 3 at (roughly) 99% of the mean, or $73,564. (#88-2 at 12, 14.)[20]

Dr. Barocci sets the foregone wages for WLY 4 to WLY 24 at the full mean of the annual wage of operating engineers, or $74,490. (#88-2 at 14.)

Dr. Barocci sets the foregone wages for WLY 24.13 at $9,968, the fraction of the mean. (#88-2 at 14.)

Benefits. Dr. Barocci sets the foregone benefits for WLY 1 to WLY 24.13 at 41.51% of the foregone wages for WLY 1 to WLY 24.13. (#88-2 at 14.)[21]

Unadjusted total. Dr. Barocci adds the foregone wage for each WLY to the foregone benefits for each WLY, and then all of the foregone wages-plus-benefits, resulting in unadjusted total foregone earnings. (#88-2 at 14.)

Adjusted total. In the mean scenario, Dr. Barocci makes the same two adjustments to the total foregone earnings that he does in the 90th percentile scenario, that is, reducing the total foregone earnings to reflect the present value as of August 2019, and then increasing that figure to reflect the present value as of August 2020. (#88-2 at 8, 9, 14.)

To calculate the low end of his range, Dr. Barocci uses the present value of foregone earnings as of August 2020 -- $1,893,358. (#88-2 at 9.)

ii. Mitigating earnings: sheet metal worker.

---

[20] 79.96% of $74,490 is $59,562.20; 90.01% of $74,490 is $67,051; and 98.76% of $74,490 is $73,564. As noted above, the court is unclear as to the source of the (roughly) 80%, 90%, and 99%.

[21] E.g., for WLY 4 to WLY 24, the foregone benefits are $30,920, see #88-2 at 13, and 41.51% of $74,490 is $30,920.80.

In the mean scenario, Dr. Barocci uses the same present value of mitigating earnings as of August 2020 that he uses in the 90th percentile scenario -- $1,336,985. (#88-2 at 9, 15.)

iii. Result.

The low end of Dr. Barocci's range -- $556,373 -- is the difference between the present value of foregone earnings as of August 2020 and the present value of mitigating earnings as of August 2020. (#88-2 at 9.)[22]

B. Discussion.

1. The reports.

First, the court excludes Dr. Vercillo's and Dr. Barocci's reports (Exhibits B and C, *see* #133-1 at 3). The reports are hearsay and include hearsay, and plaintiff makes no attempt to carry her burden.[23] *See Jones ex rel. United States v. Massachusetts Gen. Hosp.*, 780 F.3d 479, 494-495 & n.8 (1st Cir. 2015); *Salgado Colon v. Hosp. Hermanos Melendez, Inc.*, #19-cv-01797-JAW, 2023 WL 185502, at *3 (D. P.R. Jan. 13, 2023); *Echavarria v. Roach*, #16-cv-11118-ADB, 2022 WL 606076, at *1 (D. Mass. Mar. 1, 2022).

2. The testimony.

a. Law.

i. The *Daubert* inquiry.

Admissibility of Dr. Vercillo's and Dr. Barocci's testimony is governed by Fed. R. Evid. 702, which provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[22] $1,893,358 minus $1,336,985 equals $556,373.

[23] *See* #125 at 1 n.1 ("Plaintiff acknowledges that, given Defendants' objections, the expert reports, themselves, contain unexcepted hearsay at present").

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.*

The Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), assigned a "gatekeeping role" for the trial court to determine whether an expert's testimony rests on a "reliable foundation" and is "relevant." *Id*. at 597; *see Martínez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022).[24] An expert's methodology is the focus, although the court may evaluate the data in support of his or her bottom-line conclusion. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*., 161 F.3d 77, 81 (1st Cir. 1988)). There is a difference, however, between "<u>unreliable</u> support" and what a jury may conclude is "<u>insufficient</u> support" for the expert's conclusion. *Martinez*, 33 F.4th at 24 (emphasis in original) (quoting *Milward v. Acuity Specialty Prods. Grp., Inc*., 639 F.3d 11, 22 (1st Cir. 2011)). That the data supporting the expert's conclusion is "weak" is a matter affecting the weight and credibility of his or her testimony, a question to be resolved by the jury. *Id*. (quoting *Milward*, 639 F.3d at 22). Rule 702 is interpreted "liberally" in favor of admission. *Id*. (citation omitted). The Supreme Court in *Daubert* emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

---

[24] There is "no particular procedure" that a trial court must follow in conducting the *Daubert* inquiry. *Smith v. Jenkins*, 732 F.3d 51, 64 (1st Cir. 2013) (citation omitted).

> In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche*, 161 F.3d at 85.

ii. Back and front pay.

"Back pay" compensates a plaintiff for the time between discharge from employment and judgment. *Johnson v. Spencer Press of Me., Inc*., 364 F.3d 368, 379 (1st Cir. 2004). "Front pay" compensates the plaintiff for the time between judgment and reinstatement, or in lieu of reinstatement. *Id*.; *see Franchina v. City of Providence*, 881 F.3d 32, 37 n.1 (1st Cir. 2018). Back pay and front pay are available under Title VII, *see Johnson*, 364 F.3d at 379, and under Mass. Gen. Laws. ch. 151B, *see Kelley v. Airborne Freight Corp*., 140 F.3d 335, 354 (1st Cir. 1998).

Under Title VII, front pay is an equitable remedy awarded by the trial court. *Johnson*, 364 F.3d at 380; *see Franchina*, 881 F.3d at 57-58. Under Mass. Gen. Laws ch. 151B, front pay is a form of compensatory damages awarded by the jury. *Kelley*, 140 F.3d at 354; *see Conway v. Electro Switch Corp*., 523 N.E.2d 255, 257 (Mass. 1988); *Handrahan v. Red Roof Inns, Inc*., 680 N.E.2d 568, 576 (Mass. App. Ct. 1997); *see also Cummings v. Standard Register Co*., 265 F.3d 56, 59, 65 (1st Cir. 2001).[25] Under Massachusetts law, front pay awards "may not be determined by speculation or guess, . . . must be causally related to the defendant's wrongdoing, and the plaintiff should not be made more than whole." *Conway*, 523 N.E.2d at 257 (citations omitted). ". . .[T]he greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with

---

[25] Under Title VII, back pay is a presumptive entitlement, and awards are generally made by the jury. *Johnson*, 364 F.3d at 379-380.

any degree of certainty or can reasonably be attributed to the illegal conduct of the employer."

*Conway*, 523 N.E.2d at 257.[26]

        b. <u>Application</u>.

          i. <u>The purported factual errors do not warrant preclusion</u>.

The Union and School argue that Dr. Vercillo's and Dr. Barocci's assertions regarding plaintiff's performance as an operating engineer apprentice[27] are based only on plaintiff's subjective beliefs and, in fact, she received low scores on exams and was subject to a disciplinary action. (#89 at 4-5, 7.) Dr. Vercillo reviewed, among other documents, grades, evaluations, and proficiency summaries from the School. (#88-1 at 2.) Dr. Barocci relied on Dr. Vercillo's report. (#88-2 at 2, 6.) As plaintiff notes, *see* #125 at 4, defendants, *see* #89 at 4-5, draw the court's attention to a document showing that plaintiff received "Excellent" grades on operator's weekly reports from September 2017 and January and July 2019. (#68-6 at 2, 4, 6.)

Plaintiff testified at her deposition that her putative subjective beliefs about her performance as an operating engineer apprentice were informed by comments made to her, *see* #125-3 at 2-4, and defendants do not draw the court's attention to any evidence that these

---

[26] Under Title VII, factors that the court may consider in awarding front pay include, but are not limited to: (1) the plaintiff's age; (2) the length of time the plaintiff was employed by the defendant; (3) the likelihood the employment would have continued absent the discrimination; (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment; (5) the plaintiff's work and life expectancy; (6) the plaintiff's status as an at-will employee; (7) the length of time other employees typically held the position; (8) the plaintiff's ability to work; (9) the plaintiff's ability to work for the defendant; (10) the plaintiff's efforts to mitigate damages; and (11) the amount of any liquidated or punitive damages award made to the plaintiff. *Franchina*, 881 F.3d at 57 (citation omitted).

[27] *See* #88-1 at 3 (plaintiff was "an Apprentice Member in Good Standing" until expulsion); *id.* at 6 (plaintiff "was performing well in her apprenticeship both in school and at work. . ."); #88-2 at 3 (plaintiff "was routinely regarded as one of the best apprentices within the Apprenticeship Program. She was selected to speak at a Local 4 rally in the City of Somerville and to speak on behalf of the Boston Building Trades at the State House in Boston. . .").

comments were never made or were misconstrued (or, for that matter, evidence that plaintiff did not, in fact, speak at a rally or the State House).

That plaintiff was a "good worker" is confirmed by Bowes's deposition testimony. (#125-4 at 2.) In short, there is sufficient data to support the assertions regarding plaintiff's performance as an operating engineer apprentice.

The Union and School challenge Dr. Vercillo's (alleged) assertion that plaintiff was expelled from the School "'because she scored a 68 (70 is a passing score)'" on the hoisting exam "'despite the fact that she was previously told she could re-take the test.'" (#89 at 5) (quoting #88-1 at 4).[28] They argue that the assertion is misleading because plaintiff was required to pass the hoisting exam and she did not pass it, twice. Moreover, plaintiff admitted at her deposition that she did not study for the exam, either time. *Id*. (citing #68-1 at 101, 235.) Defendants are free to cross-examine Dr. Vercillo about the assertion. It is not grounds for preclusion.

The same is true of Dr. Vercillo's suggestion that plaintiff lost her Veterans Administration housing as a result of her expulsion, *see* #89 at 6 (citing #88-1 at 5),[29] as well as Dr. Vercillo's claim that plaintiff makes $12 an hour as a sheet metal apprentice, *see id.* at 10 n.1 (citing #88-1 at 5.) These assertions are fodder for cross-examination, not grounds for preclusion. They do not

---

[28] The Union and School have selectively quoted this sentence. The omitted half makes clear that Dr. Vercillo is recounting the reason for expulsion articulated at the meeting before the School trustees. (#88-1 at 4) ("In August 2019 she was called before the board of trustees of the union and told she was being dismissed from the apprenticeship training program and her position as an operating engineer apprentice because. . .").

[29] Plaintiff responds that this particular assertion "could perhaps be more artfully phrased," *see* #125 at 6, tacitly acknowledging that a claim that she lost her Veterans Administration housing as a result of her expulsion would be incorrect. Plaintiff testified at her deposition that she lost her VA housing in June 2019 because she was making too much money. (#68-1 at 102.)

have a close enough link to Dr. Vercillo's bottom-line conclusion, i.e. a 28% decrease in earning capacity, calculated using the DOL, annual wage data.

## ii. The purported methodological errors do not warrant preclusion.

The Union and School argue that Dr. Barocci's methodology is unreliable because he includes benefits in his calculations, yet the money paid by employers for benefits to union members are paid to joint employer-union funds, not to the union members directly. Furthermore, they argue, not all union members benefit from all of the money paid to the funds. For instance, money paid to an apprenticeship fund would only benefit the union members in the program. (#89 at 10-11.)

The Union and School focus on a table in Dr. Barocci's report (as well as Dr. Vercillo's). The table sets forth the Local 4 (operating engineer) Collective Bargaining Agreement (CBA) hourly wages (from $46.63 to $53.98) plus benefits ($28.11) for 2017-2021. (#88-2 at 5); *see* #88-1 at 4. This focus is befuddling to the court, where the Local 4 CBA's hourly wages plus benefits has no apparent relevance to Dr. Barocci's (or Dr. Vercillo's) bottom-line conclusion.[30] To be sure, Dr. Barocci includes benefits in arriving at his economic loss range. But he does not use the $28.11 figure. For the high end, he adds 41.51% of the 90th percentile of the annual wage for operating engineers (and of the mean annual wage for sheet metal workers). For the low end, he adds 41.51% of the mean annual age for operating engineers (and for sheet metal workers). (#88-2 at 13-15.) The source of the 41.51% is the DOL, not the Local 4 (or Local 17) CBA. *Id*. at 7-8; *see id*. at 18

---

[30] While the Union and School acknowledge, in passing, that Dr. Barocci's uses the 41.51% figure, they proceed to argue that the $28.11 figure cannot be "tacked on" to the Local 4 CBA hourly wages. (#89 at 10-11.)

Similarly, in moving to exclude Dr. Vercillo's testimony, the Union and School focus on information that she sets forth in the narrative sections of her report that has no apparent relevance to her bottom-line conclusion. *See* #89 at 12 (challenging putative comparison of Local 4 CBA hourly wage data to DOL sheet metal worker hourly wage data).

("Table 5. Employer Costs for Employee Compensation for private industry workers by bargaining and work status," including "Wages and salaries," "Paid leave," "Supplemental pay," "Insurance," "Retirement and Savings," and "Legally required benefits").[31]

Furthermore, the cases that the Union and School cite in support of an argument that inclusion of benefits "goes against common sense and prevailing legal understanding of Title VII damages" involve back pay, *see* #89 at 11,[32] yet they recognize that Dr. Barocci's work "relates mostly to front pay," *see id.* at 14 n.4. The principle set forth in the cases – that the measure of past, e.g. health insurance, benefits is the out-of-pocket expense incurred by the plaintiff in replacing the health insurance, not the premiums that the defendant would have paid – "is more logically applied only to back pay. . .given the fact that the estimated cost of *future* health insurance premiums to an employer would at best be informed speculation." *Fresquez v. BNSF Railway Co*., 421 F. Supp. 3d 1099, 1115 (D. Col. 2019) (emphasis in original) (citations omitted) (under Federal Railroad Safety Act).[33]

---

[31] The Union and School also make no argument that the types of benefits that appear to actually have factored into the 41.51% figure are akin to, for instance, the money paid to an apprenticeship fund that would only benefit the union members in the program.

[32] Although not a case cited by the Union and School (or plaintiff, *see* #125 at 10), the court notes that the First Circuit has adopted the view that, for back pay awards, ". . .benefits are recoverable only if the plaintiff has offered evidence of out-of-pocket expenses for the same benefits." *McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 305 (1st Cir. 1998); *see also EEOC v. Farmer Bros. Co*., 31 F.3d 891, 894, 902 (9th Cir. 1994) (applying view) (quoting *Galindo v. Stoody Co.*, 793 F.2d 1502, 1517 (9th Cir. 1986)); *U.S. v. City of New York*, 847 F. Supp. 2d 395, 409 (E.D. N.Y. 2012) (adopting view).

[33] Thus, the district court in *Fresquez* ruled that health insurance benefits would be excluded from the back pay award because the plaintiff had not presented evidence of his out-of-pocket expenses, but ordered the parties to calculate the front pay health insurance losses by adding a multiplier to the front pay wage losses. 421 F. Supp. 3d at 1115-1116. Here, the court notes, Dr. Barocci has added a multiplier to wage losses regardless of whether the calculation, based on the WLY, might be regarded as back or front pay. (#88-2 at 13-14.) If Dr. Barocci intends to offer testimony about back pay, his calculation of back pay must conform with *McMillan*.

Under Massachusetts law, moreover, benefits may be included in front-pay awards. *Conway*, 523 N.E.2d at 390 (Mass. Gen. Laws ch. 151B, "§ 9 authorizes an award of damages for loss of future earnings and benefits which have been proved with reasonable certainty as attributable to the employer's misconduct subject to the employee's duty to mitigate"); *see also Flebotte v. Dow Jones & Co., Inc.*, #97-cv-30117-FHF, 2000 WL 35538296, at *3-4 (D. Mass. Dec. 22, 2000) (pursuant to *McMillan*, disallowing expert's testimony regarding past benefits, where expert did calculate based on out-of-pocket expenses; but, pursuant to *Conway*, allowing expert testimony regarding future benefits, calculated by adding multiplier, from Chamber of Commerce data, to wage losses).

The Union and School argue that Dr. Barocci does not apply his own methodology consistently because he includes benefits in calculating foregone earnings, but not mitigating earnings.[34] As plaintiff points out, *see* #125 at 11, and the court's review of the attachments to Dr. Barocci's report confirms, this is simply not true. To arrive at his range, Dr. Barocci includes benefits in calculating foregone and mitigating earnings. For both, he adds the 41.51%. (#88-2 at 13-15.)[35]

The Union and School also argue that Dr. Barocci does not apply his own methodology consistently because:

> In calculating what Ms. Hussey allegedly would have made, he relies on the Local 4 collective bargaining agreement. And yet when calculating what she might earn as a sheet metal worker, he relies on Dr. Vercillo's government-calculated averages rather than the more obvious source of the Local 17 CBA.

---

[34] *See* #89 at 12 ("Although Ms. Hussey is currently in a union apprenticeship program with benefits, Dr. Barocci does not include those benefits in her current wage as mitigation. The approach appears tailored to maximum the jury's view of her economic losses, regardless of methodological rigor or consistency").

[35] Defendants' motions were filed over six months ago. Plaintiff's oppositions were filed earlier this month. Despite ample time to do so, defendants have not supplemented or corrected their motions, and did not file replies to plaintiff's oppositions.

(#89 at 12.) The Union and School thus seem to be accusing Dr. Barocci of arriving at his range by comparing apples on the foregone earnings (the Local 4 CBA) to oranges on the mitigating earnings (the DOL data for sheet metal workers), when he should have been comparing apples on the foregone earnings (the Local 4 CBA) to apples on the mitigating earnings (the Local 17 CBA). However, based on the court's review of the attachments to his report, in arriving at his range, Dr. Barocci compares oranges on the foregone earnings (the DOL data for operating engineers) to oranges on the mitigating earnings (the DOL data for sheet metal workers).[36]

Where Dr. Barocci compares oranges to oranges (the DOL data), defendants are left with an argument that Dr. Barocci should have compared apples to apples (the CBAs). (#89 at 13-14.) That argument may be addressed to the jury. *See Cummings*, 265 F.3d at 65 ("It may be true that using specific variables would have resulted in a lower, and perhaps more accurate, figure. However, during cross-examination, [economist] offered sufficient explanations for why he chose to use BLS data and [plaintiff's] 1997 salary in his calculations. . . . More importantly, [defendant] has failed to show how the information [economist] *did* use was incorrect, and does not dispute the district court's conclusion that [economist's] assumptions are ones 'that economists [make] with some frequency.'. . .We agree with the district court that whatever shortcomings existed in [economist's] calculations went to the weight, not the admissibility, of the testimony and uphold the district court's decision to allow it") (footnotes omitted) (emphasis in original).

The same is true of the argument that the DOL data combines union and non-union employees, and therefore does not account for a union "advantage." (#89 at 13 n.3.) *Cf. Falconer*

---

[36] Adding to the court's confusion, plaintiff does not respond to this argument by pointing out that Dr. Barocci compares oranges to oranges in arriving at his range. She merely responds that it was appropriate for Dr. Barocci to use oranges (the DOL data for sheet metal workers) to calculate mitigating earnings, instead of apples (the Local 17 CBA). (#125 at 9-10.)

*v. Penn Maritime, Inc.*, #05-cv-00042-JAW, #31 at 5 (D. Me. Aug. 2, 2005) (denying motion to exclude vocational expert testimony on ground that expert failed to obtain Maine-specific jobs data).

The Union and School's more compelling argument is that Drs. Vercillo and Barocci assume that plaintiff would be eligible to earn up to the 90th percentile of the annual wage as an operating engineer yet only the mean annual wage as a sheet metal worker. (#89 at 13.) While more compelling, this argument is not grounds for preclusion. It is not so obviously speculative to assume that plaintiff would earn up to the 90th percentile as an operating engineer but not as a sheet metal worker. *Cf. Eaton v. Hancock Cty.*, #08-cv-370-B-W, 2010 WL 1223600, at *1-2 (D. Me. Mar. 24, 2010) (overruling objections to order precluding expert from testifying based upon speculative assumption that plaintiff would have finished requirements to become master plumber where plaintiff had limited work history as unlicensed plumber's helper). For instance, the court might infer that earning at the 90th percentile of the annual wage for operating engineers is more likely because of the relative complexity of the heavy machinery work versus sheet metal work or because of the number of operating engineers in the labor market relative to the number of sheet metal workers. Drs. Vercillo and Barocci will be permitted an opportunity to explain this assumption to the jury.

iii. <u>The purported bolstering does not warrant preclusion</u>.

Defendants argue that in opining from plaintiff's allegations, Drs. Vercillo and Barocci usurp the jury's role in determining her credibility. (#89 at 4-5, 7-8); *see* #97 at 6. Ordinarily an expert's opinion that another witness is telling the truth is inadmissible. *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 15-16 (1st Cir. 1997); *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995). Drs. Vercillo and Barocci will not be permitted to testify that plaintiff is telling the truth.

*Cf. Jelú Iravedra v. Mun. of Guaynabo*, #16-cv-1585 (RAM), 2019 WL 5086955, at *7-8 (D. P.R. Oct. 10, 2019) (excluding defense expert's opinion that plaintiff's allegations of sexual harassment were "'highly suspicious'"); *Figueroa v. Simplicity Plan de P.R.*, 267 F. Supp. 2d 161, 166-167 (D.P.R. 2003) (excluding defense expert's opinion that plaintiffs' emotional damages claims were "unacceptable" or "not acceptable").

Drs. Vercillo and Barocci also will not be permitted to act as "narrator[s] of the facts" by repeating plaintiff's allegations or information gleaned from the medical records. *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, #11-cv-681 (KBF), 2015 WL 5459662, at *3 (S.D. N.Y. Sept. 16, 2015) ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert*'s most basic requirements"); *accord United States ex rel. Bawduniak v. Biogen Idec, Inc*., #12-cv-10601-IT, 2022 WL 2662678, at *3-4 (D. Mass. July 8, 2022) ("Courts generally do not permit experts to narrate the record by characterizing and summarizing documents and the testimony of other witnesses"); *Jelú*, 2019 WL 5086955, at *3; *United States ex rel. Dyer v. Raytheon Co*., #08-cv-10341-DPW, 2013 WL 5348571, at *12 (D. Mass. Sept. 23, 2013).[37]

Otherwise, the court is not persuaded by the bolstering argument. Defendants are free to elicit on cross-examination that Drs. Vercillo and Barocci must assume the truth of plaintiff's allegations.

---

[37] Dr. Vercillo asserts that plaintiff "was sexually harassed at work." (#88-1 at 4); *see id*. at 6 ("Secondary to sexual harassment. . .."). Dr. Barocci makes similar assertions. (#88-2 at 1, 4). Strangely, plaintiff asserts that whether she was sexually harassed at work "is undisputed." (#125 at 6.) It is disputed. *See, e.g.*, #89 at 5; #133 at 7. Plaintiff, moreover, seems to concede that whether she was sexually harassed at work is not "material" to Drs. Vercillo and Barocci's bottom-line conclusions. (#125 at 6.) In light of the above discussion, as well as this concession, Drs. Vercillo and Barocci will not be permitted to testify that plaintiff "was sexually harassed at work," either.

iv. <u>Qualifications</u>.

The Union and School challenge Dr. Vercillo's qualifications to diagnose plaintiff with mental conditions. (#89 at 6.) It is not clear to the court whether, in her report, Dr. Vercillo is opining as to plaintiff's mental conditions or simply repeating what plaintiff told her or what she read in medical records.[38]

If Dr. Vercillo would be repeating what plaintiff told her, the testimony is not admissible. Dr. Vercillo will not be permitted to act as a narrator of the facts.

If Dr. Vercillo would be opining as to plaintiff's mental conditions or repeating what she read in medical records, plaintiff will have to establish Dr. Vercillo's qualifications. Defendants may re-assert this objection at trial, and the court will take Dr. Vercillo's testimony outside the jury's presence. *See Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 198, 205-206 (D. Me. 2010) ("The extent to which [vocational expert] may testify about [plaintiff's] depression and her depression being aggravated by her termination will be determined at the time of trial. [Vocational expert] is not a trained medical professional and any opinions on medical matters or opinions based on her interpretation of medical records would be outside the realm of her expertise.")

C. <u>Summary</u>.

Defendants' motions to exclude the expert evidence (##88, 96) are **ALLOWED** in part and **DENIED** in part. The reports are excluded. The testimony must conform with the above rulings.

IV. <u>The Union and School's Motion in Limine to Preclude an Equitable Tolling Argument (#92)</u>.

---

[38] *See* #88-1 at 5 ("After her dismissal from the Operating Engineers Ms. Hussey resumed psychological counseling secondary to increasing depression and anxiety at the VA Hospital. In addition to increased PTSD symptoms, anxiety, and depression. . . ."); *id.* at 6 ("After her dismissal from the operating engineer's apprenticeship Ms. Hussey's PTSD was exacerbated").

As noted above, the court ruled on summary judgment that the jury will decide whether the equitable tolling doctrine applies. (#75 at 15 n.12.) The Union and School nevertheless move to preclude an equitable tolling argument, see #92, because plaintiff retained counsel before November 18, 2019, the date of demand letters, and therefore had constructive knowledge of her legal right to be free from gender discrimination and sexual harassment before the 300-day MCAD deadline expired, *see* #93 at 5-7. *See also* ##92-1 (demand letter to the Union), 92-2 (demand letters to East Coast Slurry)[39] Plaintiff argues that it is inappropriate for the Union and School to seek to re-litigate the issue. (#127.)

The Union and School are correct that it may be presumed that plaintiff had constructive knowledge of her legal right upon retaining counsel. *See Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 48-49 (1st Cir. 2005); *see also Cano v. United States Postal Service*, 755 F.2d 221, 222 (1st Cir. 1985) (per curiam). However, 300 days did not pass between November 18, 2019 and the date of plaintiff's MCAD charge, April 13, 2020. Fewer than 150 days passed in that span. Plaintiff may be able to establish at trial that she lacked knowledge and that misconduct of a defendant prevented or deterred her from filing the MCAD charge for some period of time between the alleged sexual harassment and November 18, 2019, and that period of time may be determinative.[40]

---

[39] The court will hear the School's argument that it is subject to a 180-day limitations period at the final pretrial conference. *See* #91 at 9-10; *see also* #93 at 6 n.1.

[40] The cases upon which the Union and School rely, *see* #93 at 5-7, do not compel a different result. In them, the plaintiff had hired or consulted with an attorney before or at the time of the event alleged to warrant application of the equitable tolling doctrine. *See Kelley v. NLRB*, 79 F.3d 1238, 1249 (1st Cir. 1996) (plaintiff represented by counsel at time of delayed service); *Conroy v. Bos. Edison Co.*, 758 F. Supp. 54, 56, 61 (D. Mass. 1991) (plaintiff hired attorney before filing MCAD charge that omitted age discrimination claim allegedly on instruction of MCAD official); *Cano*, 755 F.2d at 222 (plaintiff consulted with attorney before and during limitations period; plaintiff's own illness during limitations period would not affect attorney's knowledge of legal remedies).

The Union and School's arguments, *see* #93 at 3-5, about plaintiff's actual knowledge when she reported Atkins' behavior and the reasonableness of her belief that the Union or School were still handling the issues after she was expelled can be addressed to the jury, which will resolve the factual disputes.

The Union and School's motion to preclude an equitable tolling argument (#92) is **DENIED**.

V. <u>Other</u>.

Regarding the evidentiary disputes discussed in the joint pretrial memorandum but not raised by motions in limine, the parties are ordered to confer further. The court cannot rule on these disputes because the parties generally have failed to describe the contested exhibits and anticipated testimony adequately.

However, plaintiff is advised that the court does not anticipate admitting regulations (Exhibit H, *see* #133-1 at 3). It is the court's role to instruct the jury on the law. *Cf. Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997).

Defendants are advised that the court does not anticipate admitting the settlement demand letters (Exhibits V and X, *see* #133-1 at 3-4). *See* Fed. R. Evid. 408. Defense counsel are encouraged to confer with plaintiff's counsel regarding a stipulation as to the date that plaintiff retained counsel.

VI. <u>Orders</u>.

##118, 119, and 100 are **DENIED** without prejudice, and the parties are ordered to confer further;

#98 is **ALLOWED** in part and **DENIED** in part;

———————————————————

##88 and 96 are **ALLOWED** in part and **DENIED** in part; and

#92 is **DENIED**.


February 21, 2023                                    /s/M. Page Kelley
                                                     M. Page Kelley
                                                     Chief U.S. Magistrate Judge